[L. A. No. 1656. In Bank.—April 1, 1907.]

## KATHERINE TINGLEY, Respondent, v. TIMES MIRROR COMPANY, (a Corporation), Appellant.

PLEADING—AMENDMENTS AS OF COURSE — LIMITATIONS OF TIME FOR AMENDMENTS.—Section 472 of the Code of Civil Procedure, providing that ''Any pleading may be amended once by the party of course, and without costs, at any time before answer or demurrer filed, or after demurrer, and before the trial of the issue of law thereon, by filing the same as amended, and serving a copy on the adverse party, who may have ten days thereafter in which to answer or demur to the amended pleading,'' is to be liberally construed, so as to confer an equal right to amend to both parties as to all pleadings, but not so as to confer greater rights upon one in that respect than are accorded to the other, or to work a hardship on either party, or to interfere with the progress of a trial after the issues of fact have been made. This right to amend, while applying to the pleadings of both parties, has its limitation as to the time within which either may exercise it under the section, and such time is not ,extended in behalf of the defendant beyond final joinder on the issues of fact in the case.

ID.—WHEN DEFENDANT MAY AMEND ANSWER AS OF COURSE. — The proper construction of that section is, that the right of plaintiff to amend his complaint as of course is extended only up to the time when the answer of defendant is filed, or if a demurrer is interposed by defendant only while the issue of law raised thereby is undetermined. If the defendant answers without demurring, or if his demurrer to the complaint is overruled, the right of plaintiff under the section to amend as of course is gone. The right of defendant to amend can be exercised only during the time that a demurrer to the answer, if interposed by plaintiff, is undetermined, or should the plaintiff not demur, then the defendant is concluded from amending as of course under the section by the expiration of

CLI Cal.—1

the time within which such demurrer might have been interposed. When the demurrer of the plaintiff to the answer is overruled, or the time has expired within which the plaintiff might have demurred to the answer, the issues of fact are then fully joined, and the right of the defendant to amend under the section as of course is gone.

ID.—DILATORY PLEAS—DISCRETION OF COURT IN REFUSING.—Pleas that the plaintiff is a married woman, and that her husband has not been joined as a party, and that as a married woman she had no legal capacity to bring or maintain the action, are dilatory and not to be favored. And where the defendant waives such pleas by omitting to set them up in the original answer, it is not an abuse of the discretion of the trial court, after the trial has commenced, to refuse to permit them to be set up by an amended answer, where the application to amend was unaccompanied by any showing that when the original answer was filed the defendant did not know of the facts set up in the pleas, or that the failure to then set them up was inadvertent, or that knowledge of the facts was acquired subsequent to the filing of the original answer.

LIBEL—MALICE IN FACT—EXEMPLARY DAMAGES—EVIDENCE.—In an action for libel, allegations in the complaint that the defendant "wickedly and maliciously and with intent and design to injure, disgrace and defame plaintiff and to bring her into public discredit and obloquy, printed and published" the article complained of, and "that said publication was false, malicious and defamatory," sufficiently aver an actual intent to defame, amounting to malice in fact, which furnishes a basis for the imposition of exemplary damages, as contradistinguished from malice in law, which will support a verdict for compensatory damages only. Under such allegations, evidence of the publication of other articles of a similar defamatory character, made prior and subsequent to the publication of the article complained of, is admissible to prove malice in fact, either actual or presumed, as a basis for an award of exemplary damages.

ID.—PRESUMPTION OF MALICE IN FACT.—While it is the rule in this state that exemplary damages for libel can only be recovered on proof of malice in fact, such malice may be either actual or presumed, and may be proved by the article published itself. Where the publication is libelous *per se*, the law presumes malice in fact in its publication, and in the absence of evidence on the part of the defendant rebutting this presumed malice, the plaintiff is entitled to an award of exemplary damages.

ID.—NEWSPAPER—SUSCEPTIBILITY TO MENTAL SUFFERING.—In an action for libel against the publisher of a newspaper, the fact that the plaintiff, on her examination in chief, testified merely that she had suffered very much mentally in consequence of the article published by the defendant, did not warrant her being cross-examined as to litigations, public controversies, and newspaper articles, other than the publications of the defendant, affecting her or in which

she had been engaged. Such evidence was not admissible as tending to throw any light upon her susceptibility to mental suffering. Nor can she be cross-examined for such purpose as to her family ties, past history, or occupation, where she had given no testimony on such subjects on her examination in chief.

ID.—EVIDENCE OF DEFENDANT'S PROPERTY.—In such action, where exemplary damages are claimed, and proof thereof is admissible, evidence of the value of the property of the defendant may be introduced by the plaintiff; and there is no difference in this rule whether the defendant is a corporation or an individual.

ID.—WANT OF MALICE—ELIMINATION OF OTHER LIBELOUS MATTER.— The defendant in such action cannot introduce evidence to show that certain matter derogatory to the plaintiff was eliminated by its editor from the article as prepared by its reporter before its publication. Such evidence was not admissible to show a want of malice.

ID.—MISCONDUCT OF COUNSEL—REBUKE BY COURT.—It is not error for the court to rebuke counsel for one of the parties, who during the trial, and in the presence of the jury, wrongfully accuses opposing counsel of intentionally pursuing a course of reprehensible misconduct.

ID. — UNPREJUDICIAL MISCONDUCT OF COUNSEL — STATEMENTS BEFORE JURY.—Pending the trial before a jury of an action for libel against the publisher of a newspaper, counsel for the plaintiff, in the presence of the jury, called the attention of the court to an article published by the defendant, which he stated contained an unfair account of the trial, and as to which he expressed the belief that it was intended by the defendant to influence the jury. The article referred to was not read to the jury, and upon being interrogated each juror disclaimed having seen the article. The court promptly instructed the jury that they were not to be influenced in the least degree by the remarks of counsel. *Held,* that the statement by the counsel for the plaintiff was not such misconduct as to warrant a new trial.

ID.—PLEA OF JUSTIFICATION—PLEADING.—A plea in justification of an alleged libel must always be as broad as the charge and of the very charge attempted to be justified; and while it is not necessary to justify every word of the libel, still the plea must meet the substantial imputation—the sting of the charge—as an ordinary reader of the article would understand it to have been made.

ID.—PLEA IN MITIGATION—RUMORS.—A plea in mitigation of an alleged libel is insufficient unless it be alleged that the defendant had knowledge of the facts set up in mitigation prior to the publication of the article from reliable sources, or had ascertained them after due investigation, and believed them to be true. An allegation that there were rumors of the matters set up in the plea is insufficient.

ID.—DEPOSITIONS OF WITNESSES—GENERAL REPUTATION OF PLAINTIFF. —Depositions of witnesses testifying to the general reputation of the plaintiff in an action for libel are properly excluded, where the

witnesses were not shown to have any knowledge of the general
reputation of the plaintiff in the community in which she resided,
and the questions propounded to them did not indicate what, if any,
kind of reputation was being inquired into—whether general reputa-
tion for traits of honesty and integrity, or specific traits involved
in the action.

ID.—OPINION OF STRANGER IN COMMUNITY.—A stranger to a community,
entering into it with special bias against another, cannot testify as to
his opinion of the reputation of that other, based upon interviews
with a limited number of persons in the community.

INSTRUCTIONS — BIAS OF COURT. — The instructions to the jury, held
not to disclose, from their general tenor, any bias in the mind of
the court against the case of the defendant.

ID.—ISSUES NOT BEFORE JURY.—The court, in instructing the jury,
may declare to them what issues were before them, and may also
state that certain other issues were not involved.

APPEAL from a judgment of the Superior Court of San
Diego County, and from an order refusing a new trial. E.
S. Torrance, Judge.

The facts are stated in the opinion of the court.

Eugene Daney, and Hunsaker & Britt, for Appellant.

J. W. McKinley, W. R. Andrews, A. B. Hotchkiss, F. R.
Kellogg, and J. E. Wadham, for Respondent.

LORIGAN, J.—This action was brought to recover dam-
ages for libel.

The complaint alleged that plaintiff was a resident of the
county of San Diego, and the head of an institution known as
the "Universal Brotherhood Headquarters, Loma Home-
stead," at Point Loma in said county; that the defendant
corporation was the owner and publisher of the Los Angeles
Daily Times, a newspaper of general circulation; that on
October 28, 1901, the defendant "wickedly and maliciously
and with intent and design to injure, disgrace and defame
this plaintiff and to bring her into public discredit and ob-
loquy," published in said paper of and concerning plaintiff
the following "false, libelous, malicious, and defamatory ar-
ticle, to wit:—

"Outrages at Point Loma.

"Exposed by an 'Escape' from Tingley. Startling Tales told in this City. Women and Children starved and treated like Convicts. Thrilling Rescue.

"Mrs. M. Leavitt, of No. 418 West Fourth Street, a believer in what she terms 'the true school of theosophy,' who has recently removed to this city from San Diego, the capital city of theosophists, has some startling things to tell concerning the practices of Catherine Tingley, and her associates, who conduct the Universal Brotherhood Homestead on Point Loma. Mrs. Leavitt seems to be thoroughly informed on two of the latest outrages perpetrated at the spookery, the cases of Mrs. Neirsheimer and Mrs. Hollbrook, both well-to-do Eastern women. Mrs. Hollbrook, the wife of a railroad man and Freemason of the East, has been rescued from the roost on Point Loma by her husband with the aid of an officer and a gun, and now hovers at the point of death from the abuse she says she received while confined in the 'Homestead.' During the daytime she was worked in the field like a convict, forced to plant trees, hoe corn and perform all sorts of hard labor and at night she was shut up in a cell and guarded as if she were a raving maniac. When her husband found what a trap she had fallen into he hurried here and took her out by force.

"The other case on which Mrs. Leavitt is posted is that of Mrs. Neirsheimer, who has been forcibly separated from her husband, who is also in the Tingley clutches, and is not allowed to speak to him. She is forced to live alone in a little tent in the grounds that surround the crazy institution. Armed men guard this place of horror, and, Mrs. Leavitt says, solitary confinement, hard labor and starvation are resorted to by the Tingley managers as punishments upon those who disobey their iron rules.

"The woman who gives out this information is a personal friend of, and has talked with, Mrs. Hollbrook, the victim whose health has been forever destroyed by the ordeals she passed through while imprisoned on Point Loma.

"Mrs. Leavitt claims that through a strong hypnotic power Catherine Tingley works her will on sensible people. The Universal Brotherhood, or, in other words, Catherine

Tingley, is an offshoot of the theosophic society, which became disjointed some four or five years ago. Mrs. Tingley was formerly—the theosophists say, a common, dollar-taking spirit medium.

"She couldn't agree with the theosophists, so she branched off and set up her trap on Point Loma. She distributes literature throughout the East, and even in foreign countries, saying the Universal Brotherhood Homestead, located in the most beautiful spot on earth, offers to those who wish to retire into a quiet thoughtful life, a home in which they may live peacefully and an atmosphere of soul study and pure thought.

"Only people with money happen to get these pamphlets, says Mrs. Leavitt. When people answer her enticing advertisements in person Mrs. Tingley exerts her influence over such as are spookily inclined; and the almost incredible things which have taken place prove that once in the lair it is almost impossible to escape.

"Mrs. Leavitt says there is nothing taught at Point Loma but insane ceremonies; that the girls who are placed there to be educated are put to work at the most menial tasks, each one kept separate in a guarded cell and forbidden to speak to anybody else, and that the poor little children are quartered in a miserable building some distance from the main institution, and are continually on the verge of starvation—for Mrs. Tingley openly states that children are fed too much for their spiritual good, and must eat but little, so they will be more ethereal. Mrs. Leavitt says she knows personally of a case where both parents and children are victims, and the children have been taken away to the child pen and are never allowed to communicate in any way with mother or father. For, says Mrs. Tingley, they will grow up purer if away from bodily and affectionate influence of the parents.

"The children are never allowed to speak to anybody except when they are selling trinkets to the visitors who come to the gates. The young lady prisoners make fancy work, which they sell to the strangers. Purple robes are worn by the women, and a sort of khaki uniform by the men.

"On certain occasions a midnight pilgrimage is made by both men and women to a spot on the peninsula, which is

termed sacred ground. They go in their nightrobes, each holding a torch.

"Before she had gotten well into the scheme, Mrs. Hollbrook says she saw that it was a fake, but having no idea of the horror of it she decided to go into the Homestead for a while that she might expose the character of the crazy institution. Whether she will live to carry out the good work is doubtful. She can tell things, her friends say, more shocking than anything known yet.

"Mrs. Leavitt alleges that gross immoralities are practiced at Point Loma by some of the disciples of spookism as it is there exemplified, and that such things should not be tolerated in a civilized community."

It is then alleged that said publication was false, malicious, and defamatory, that plaintiff was not and had not been guilty of any of the matters so charged, and that all and every portion of said article charging plaintiff with improper practices, fraud, and immorality were false, malicious, libelous, and untrue, closing with a prayer for damages in the sum of fifty thousand dollars.

A demurrer to the complaint having been overruled, defendant on March 29, 1902, filed an answer. No demurrer to the answer was filed by plaintiff. Thereafter the case was set down for trial on December 16, 1902. On December 15, 1902, the day before the trial was to commence, defendant, without leave of the court, served upon plaintiff and filed an amended answer. When the case was called for trial on the 16th, the plaintiff moved the court to strike out the amended answer of the defendant filed the day before, on the ground that it had been filed without leave of court, or authority of law, and changed the issues made in the action by introducing pleas in abatement. These pleas in abatement were relative to the coverture of plaintiff and nonjoinder of her husband as a plaintiff in the action. The court granted the motion, defendant reserved an exception, and the trial of the cause was then proceeded with. After a jury had been impaneled defendant moved the court to be permitted to file the same answer as had been previously stricken out, which motion was denied. Defendant then eliminated from said answer the pleas in abatement, and, with the consent of plaintiff, the answer as so amended was

filed, and the cause was thereupon tried under the issues made by the complaint and this amended answer. The amended answer of defendant set up as the main defense a plea in justification as to the greater portion of the charges in the publication, by alleging that these portions of the charges were true; as to other portions of the charges it set up no defense whatever, and as to one of the charges alleged facts purporting to state a plea in mitigation of damages.

It is unnecessary to particularly detail these defenses. The court in its instructions took up all the charges made by defendant and claimed by plaintiff to have been libelous, and which defendant alleged in its answer were true, and instructed the jury that practically as to all of them there was no legal proof of their truth, and that the jury should regard them as false. The correctness of this instruction is not questioned on this appeal. Neither as to these charges upon which the jury were so specifically instructed, nor as to any other issue in the case, is it claimed that the evidence was insufficient to sustain them or the verdict. No point is at all made as to the sufficiency of the evidence.

The trial of the cause resulted in a verdict in favor of plaintiff for seven thousand five hundred dollars. A motion of defendant for a new trial was denied, and this appeal is from the judgment entered on the verdict, and the order denying the motion for a new trial, the record on these appeals consisting of the judgment-roll and certain bills of exceptions.

In support of its appeals and as grounds for reversal, it is insisted by appellant,—1. That the court erred in striking defendant's amended answer from the files and in refusing it permission to refile the same until certain defenses had been eliminated therefrom; 2. That the court erred in the admission and exclusion of evidence; 3. That the action of the court and of counsel for plaintiff during the progress of the trial, constituted misconduct and error prejudicial to the defendant; 4. Error in giving instructions to the jury and in the general hostile tenor of the court's charge; lastly, refusal of the court to give a certain instruction requested by defendant.

The general points urged for a reversal are based (aside from questions relative to instructions) upon a vast number

of exceptions grouped and classified under twenty heads in the° brief of counsel for appellant. Under these circumstances we shall take up such as we deem merit special consideration.

1. As to the action of the court in striking out the amended answer of defendant. It is insisted by appellant that it had an absolute right to file said amended answer when it did, without leave of the court, and this claim is based upon section 472 of the Code of Civil Procedure, which provides that: ''Any pleading may be amended once by the party of course, and without costs, at any time before answer cr demurrer filed, or after demurrer, and before the trial of the issue of law thereon, by filing the same as amended, and serving a copy on the adverse party, who may have ten days thereafter in which to answer or demur to the amended pleading.''

The precise point made by appellant has not heretofore been passed on by this court, and we are aided none by a consideration of the authorities cited by appellant from other jurisdictions, because, as we read these authorities, they deal with statutory provisions relating to amendments either giving an absolute right to amend, by express language, at any time, or providing that the amendment may be made at any time before trial. But under a most liberal construction of our statutory provision no such right is conferred. In fact, it is insisted by respondent that under the section the only right conferred is the right to amend the complaint before answer or demurrer is filed thereto, or while the issue raised by demurrer to it is undetermined. The obvious purpose of the section, however, negatives such a strict construction, even if the language used might warrant it. The provision is in aid and furtherance of the right of parties litigant to amend all pleadings with a view of presenting for trial the real merits of a controversy—assertive and defensive—and to that end it should be liberally construed. It would be eminently unjust, except where no other conclusion was warranted, to hold that it was the purpose of the section to confer a right upon the plaintiff to amend his pleadings which was denied a defendant. But while the section is to be construed liberally as conferring an equal right to amend upon both parties as to all pleadings, still its terms are not to be enlarged

by such construction so as to confer greater rights upon one in that respect than are accorded to the other, or to work a hardship on either party, or to interfere with the progress of a trial after the issues of fact have been made. This right to amend, while applying to the pleadings of both parties, has its limitation as to the time within which either may exercise it under the section, and such time is not extended in behalf of the defendant beyond final joinder on the issues of fact in the case.

Appellant claims that it had a right to amend at any time before trial because plaintiff did not demur to the answer. Its position is that the terms of the section providing that "any pleading" may be amended at any time "before answer or demurrer filed," must be construed as extending the period for filing an amended answer up to the time of the trial, unless the plaintiff demurs to the original answer and the demurrer is disposed of. Under this theory of appellant the right of defendant to amend is curtailed, or extended, as the plaintiff elects to demur or not to demur; that notwithstanding the answer is unassailable, plaintiff must still file a frivolous demurrer to it, and have such demurrer determined, in order to preclude defendant from amending. Certainly the legislature never contemplated such an idle act. In providing that a pleading might be amended "before demurrer filed," it was intended to give the right to amend, within the legal time the adverse party had within which to demur, without waiting to have the defect in the pleading pointed out on demurrer, or without taking the hazard that his adversary would not demur, and so preclude him from amending as of course under the section. It was not intended to confer a special right on a defendant to amend because plaintiff had not gone through the idle ceremony of demurring to an apparently good and sufficient answer. The construction which, in our judgment, is to be given to the section and which commends itself as a reasonable and consistent one, is that the right of plaintiff to amend his complaint as of course is extended only up to the time when the answer of defendant is filed, or if a demurrer is interposed by defendant only while the issue of law raised thereby is undetermined. If the defendant answers without demurring, or if his demurrer to the complaint is overruled, the right of plaintiff under the

section to amend as of course is gone. The right of defendant to amend can be exercised only during the time that a demurrer to the answer if interposed by plaintiff is undetermined, or should the plaintiff not demur, then the defendant is concluded from amending as of course under the section, by the expiration of the time within which such demurrer might have been interposed. When the demurrer of the plaintiff to the answer is overruled, or the time has expired within which the plaintiff might have demurred to the answer, the issues of fact are then fully joined and the right of defendant to amend under the section as of course is gone.

This we think is the reasonable construction to be placed on the section. Under this construction equal rights to amend are given to both parties; each has a right to amend while the issue of law raised by demurrer to his pleading is undetermined. Where a demurrer is not interposed the right of plaintiff to amend is concluded by the answer of defendant, and the right of defendant is concluded by the expiration of time within which plaintiff might have demurred to the answer.

This construction is likewise fair and just to all parties and works no injury or hardship, which might in many instances otherwise follow if the construction contended for by appellant that he had an absolute right to amend his answer at any time before trial was to obtain. If this were true, then by filing his amended answer on the morning of the trial, after the case had been at issue for months, and when plaintiff was prepared for trial, and ready with his witnesses to proceed, defendant could compel plaintiff, either to proceed with the case under new issues he was not prepared to try, or compel him to obtain a continuance of the cause, possibly at great expense. No relief could be granted plaintiff for the loss incurred by him under such circumstances; no terms could be imposed upon the defendant though the filing of his amended answer at that time worked a continuance, because if, as contended by appellant, he had an absolute right to file his amended answer at that time, he was entitled to do so, no matter what hardship was worked to his adversary; and as his right was absolute, no terms or conditions could be imposed by the court on its exercise. It was

never contemplated by the section that the right of defendant to amend should be extended so as to make such results possible. If the legislature had intended that the defendant should have the right to amend at any time after issue of fact joined and thus extend him a larger right than was accorded plaintiff, and one which might be exercised to plaintiff's injury, it would have been very easy to have said so instead of providing that amendments should be made "before answer or demurrer filed." Appellant does not claim that any express language of the section supports his contention. He claims from the language which is used that it was the intention of the legislature to confer the right as he asserts it. The matter, therefore, resolves itself into a question of construction, and we think that the construction placed by the trial court on the section was clearly in accord with the intention of the legislature,—namely, that the time within which defendant might amend his answer as of course should not extend beyond the time when the issues of fact were definitely fixed by the expiration of the time within which the plaintiff could demur to the answer, but did not. This is not only a reasonable and fair construction, but is one which creates no hardship, because, even after issue joined, the trial court under section 473 of the Code of Civil Procedure is authorized to permit amendments to the pleadings in furtherance of justice.

2. Now, as to the contention that the court erred in refusing to grant the subsequent motion of defendant to be permitted to file this same amended answer with the pleas in abatement set up therein. This the court refused, but as it allowed the defendant thereafter to file the amended answer with all the defenses, other than these pleas contained therein and the defendant did so, the question is limited to whether it was error to refuse leave to interpose it with these pleas included. There were two of these pleas set up in the amended answer, and they had reference to the coverture of plaintiff; in the first it was alleged that at all of the times mentioned in the complaint plaintiff was, and is yet, a married woman, the wife of Philo B. Tingley, who is not joined with plaintiff as a party to the action; and in the second it was alleged that plaintiff had no legal capacity to bring or maintain the action for the same reason.

We do not think the court erred in denying the application of defendant to be permitted to file its amended answer containing these pleas. The application for leave to do so was not made until after the trial had commenced, and was made under the provisions of section 473 of the Code of Civil Procedure investing the court with discretion to allow amendments to any pleadings, in furtherance of justice.

These pleas which defendant sought to avail itself of by amendment were dilatory pleas—pleas in abatement—and such pleas have never been favored in law. They did not concern the merits of the action, but were interposed to defeat its maintenance. Such pleas do not commend themselves, when application is made to amend a pleading so as to assert them, with the same favor as do amendments interposing defenses which go to the merits of the controversy. This disfavor in which they were held at common law is reflected in the provisions of our code relative to their interposition, where it is provided that, unless they are asserted at the earliest opportunity, they are waived, and the code declares what shall be the earliest opportunity.

If there is a defect in parties plaintiff apparent upon the face of the complaint, or if it appear therefrom that plaintiff has not the legal capacity to sue, the objection on either of these grounds must be taken by demurrer, or is waived. If these matters do not appear on the face of the complaint, any objection or defense as to them must be taken advantage of by answer, or is deemed to be waived. (Code Civ. Proc., secs. 430, 433, 434.)

Now the earliest opportunity available to the defendant, as these objections could not be urged on the face of the complaint, was to take advantage of them in the original answer, which it did not do; hence they were to that extent waived. It is insisted by respondent that this failure to set up these defenses in the original answer of defendant was a waiver of them "once for all," and that defendant could not be permitted to assert them by amended answer. We are not inclined to hold to that extent. As they were, however, apparently entirely waived by failure to set them up in the original answer, the court was not required, in the face of that waiver, to permit defendant subsequently to assert them without some showing tending to relieve it from the effect of

the waiver, and nothing was offered for that purpose. There was no showing whatever upon the subject. As far as the record is concerned, there is nothing to show but that when the original answer was filed the defendant knew of the facts set up in the pleas, and deliberately waived asserting them. There is nothing to show that the defendant had acquired information of the facts subsequent to the filing of the original answer, or, if it then knew of them, its failure to interpose them was inadvertent. Having waived these defenses originally, and no showing being made to the court of any facts warranting relief from such waiver, and an application to amend in the respect sought being made after the trial had commenced, it cannot be said that there was any abuse of the discretion of the court in denying defendant's application to amend.

3. The next point made is that the court erred in admitting evidence in support of the claim of plaintiff for exemplary damages. In this regard it is insisted that the allegations of the complaint were not sufficient to support a claim for damages of that character, because there is no distinct averment of express malice—malice in fact—influencing defendant in making the publication.

It is alleged, however, in the complaint that the defendant "wickedly and maliciously and with intent and design to injure, disgrace and defame plaintiff and to bring her into public discredit and obloquy printed and published" the article complained of, and "that said publication was false, malicious and defamatory."

We think the above allegation with reference to the character and nature of the publication, coupled with the further allegation declaratory of the purpose of the publisher in making it, amounts to more than a mere allegation of malice in law—a wrongful act done intentionally without just cause or excuse—which is essential to support every action for libel. The allegation that the publication was "wickedly" and "maliciously" made by defendant with "intent and design" to injure the reputation of plaintiff by the publication of the defamatory matter concerning her, charges a malevolent disposition of mind towards plaintiff, inspiring and actuating the publication. It clearly declares an actual intent to defame amounting to malice in fact,

which furnishes a basis for the imposition of exemplary damages as contradistinguished from malice in law, which will support a verdict for compensatory damages only.

But in addition to this, while it is the rule in this state that exemplary damages for libel can only be recovered on proof of malice in fact, such malice may be either actual or presumed, and may be proven by the article published itself. The article complained of by plaintiff is set forth fully in the complaint and is libelous *per se*. It imputes to the plaintiff fraudulent conduct, acts of cruelty, gross immoralities, and dishonest practices, which, if true, would bring her into public contempt and disgrace. When such a publication, actionable *per se*, is set forth in the complaint, under the rule obtaining in this state it is not necessary to charge that the publication was actuated by malice in fact on the part of the publisher. Where the publication is libelous *per se*, the law presumes malice in fact in its publication, and in the absence of evidence on the part of the defendant rebutting this presumed malice, plaintiff is entitled to an award of exemplary damages.

In this regard it is said by this court: ''Exemplary damages may be recovered when malice on the part of the defendant is established as a fact, and by the express provisions of section 3294 of the Civil Code this malice may be 'actual or presumed.' We assume that the word 'actual,' as used in this section of the code, means 'express.' In criminal law malice is an element of murder, and this malice may be either express or implied. It is implied when no considerable provocation for the killing appears, or when the circumstances of the killing show an abandoned and malignant heart. We are inclined to believe that the presumed malice of section 3294 closely assimilates to the implied malice of the criminal law. It is an inference of fact to be drawn from the libelous character of the publication; and, if the article is libelous *per se*, we see no reason why the law should not declare that upon its introduction in evidence a *prima facie* case of malice in fact is established; for, even though it be presumed malice, it is malice in fact, and has all the dignity and gravity of express or actual malice, proven *aliunde*. We conclude that presumed malice is equally a question of fact with actual malice, and upon being established equally forms the foundation for the

recovery of exemplary damages.'' (*Childers* v. *San Jose Mercury P. and P. Co.,* 105 Cal. 284, [45 Am. St. Rep. 40, 38 Pac. 903]; *Taylor* v. *Hearst,* 107 Cal. 262, [40 Pac. 392].)

Certainly under these authorities the allegations in the complaint were sufficient to warrant the introduction of evidence on the part of plaintiff to prove malice in fact, either actual or presumed, as a basis for an award of exemplary damages. The evidence admitted over defendant's objection were publications by defendant of a number of other articles relative to defendant of the same character as the article set forth in the complaint, and made prior and subsequent to its publication, and we are satisfied they were properly admitted.

4. It is contended that the court erred in prohibiting cross-examination of plaintiff as to her family ties, past history, and occupation; also as to public controversies engaged in by her with certain ministers involving the relative merits of theosophy and Christianity; also concerning attacks made on her and the institution of which she was the official head, in newspapers other than that of defendant, and prior to the publication of the articles sued on; and relative to *habeas corpus* proceedings involving the right to the custody of two minor children who were in the institution at Point Loma under the supervision of plaintiff.

There was no error committed by the court in its rulings in this respect. The plaintiff testified on her examination in chief simply that she was the official head of the Universal Brotherhood, residing at the Homestead at Point Loma; that she had a very large acquaintance and correspondence with persons throughout the United States and in foreign countries; and that she suffered very much mentally in consequence of the article published by defendant. It is quite apparent from this statement of her testimony on the direct examination that there was not even a remote reference made in it to any of the matters to which the cross-examination was directed. But it is said by appellant that because the plaintiff testified that she suffered greatly mentally by the publication of the defamatory matter concerning her, that this opened the door for inquiry by the defendant into her capacity for suffering and the sources whence the same came. The ''sources whence the same came'' have reference to the litigation, public controversies, and newspaper articles other than the publication of

defendant, concerning her engagement in and knowledge of which defendant sought to make inquiries of plaintiff. Under no theory could any inquiry or evidence concerning them be permissible or admissible. Certainly the defendant in the presentation of its defense could not have introduced evidence upon these matters in mitigation of damages or for any other purpose. Such an offer could only be supported and sustained upon the theory that defendant had a right to show that, notwithstanding the publication made by it was libelous and otherwise calculated to cause mental anguish to plaintiff, still that she had been so involved in litigation and public controversies, and been so greatly libeled by other articles published in newspapers, that thereby her capacity for mental suffering had been so exhausted or depleted that when defendant made its libelous contribution the plaintiff could not have been affected by it, or if such capacity had not been exhausted that the jury by some psychological standard not suggested by appellant, could measure the extent of the suffering of plaintiff by the libelous article of defendant, distinct from her suffering by reason of these other matters and libels, and make its award against defendant accordingly. In all the law relative to libel—text-book or decision—no authority is cited in support of the claim of defendant and obviously none could be.

Neither was the defendant entitled to examine plaintiff as to her family ties, past history, and past occupation in aid of the same asserted purpose—to throw light upon her susceptibility to mental suffering. Certainly if the defendant did not have the right to cross-examine her as to these matters for that particular purpose, it had no right to examine her as to them at all, because plaintiff had not testified on any of these subjects in her direct examination. She had not testified why she had suffered greatly from the article published by defendant, nor testified that it was intensified because of her family ties, nor on account of her past or present mode of living or occupation. It is true that in *Cahill* v. *Murphy*, 94 Cal. 29, [28 Am. St. Rep. 88, 30 Pac. 195], cited by appellant, it is held that in an action of slander a married woman might testify to the number and respective ages of her children for the purpose of showing increased mental suffering by reason of the fact that the members of her family would suffer on

account of the disgrace visited upon her by the slanderous charge, and as bearing on her right to enhanced damages therefor. But, as plaintiff did not testify as to any family ties on direct examination, the case cited furnished no authority for defendant to go into the subject on cross-examination. Neither did she testify as to her past history or past occupation. No such testimony would have been admitted on her part on any theory. She could not have related it for the purpose of showing that she was more sensitive to attack in newspapers and suffered greater mental anguish from them than the ordinary woman, and in the absence not only of any testimony by her on these subjects, but likewise the absence of any right on her part to offer it, certainly the defendant was not warranted in cross-examining her for the purpose of ascertaining it. As to the broad proposition that these inquiries were proper as bearing on the susceptibility of plaintiff to mental suffering, we think it absolutely untenable. We are not now considering the question of the right of a defendant to show the general reputation of a person suing to recover damages for libel, or his general bad reputation with reference to particular traits involved in the alleged libel. It is admitted that general bad character may be shown for the purpose of decreasing the damages, or entirely defeating their recovery. The inquiries and questions here, however, do not go to the subject of general reputation as bearing on the question of damages, but are directed toward developing the past history of the plaintiff, as a history, for the purpose of showing the degree of her susceptibility to suffering from the alleged libel, as one of the elements to be considered by the jury in support of her claim for damages. The theory of the defendant appears to be that, because a plaintiff testifies that a libelous article has caused him great mental suffering, that the whole course of his past life —its entire history—is thereby subject to investigation; that the defendant may proceed to develop on cross-examination his whole career from infancy to the date of the alleged libel; inquire into the extent of his education, the environments of his youth and age, his habits, predilections, vocation, natural and moral instincts, his views upon religious, social, moral, or ethical questions, in fact investigate his physical, social, and moral life for the purpose of having the jury determine to

what extent he was capable of or susceptible to mental suffer-
ing from a given libelous publication. We have examined
all the authorities which counsel for appellant have cited in
support of this theory and find not one which gives it the
slightest countenance. They deal with the right to show gen-
eral reputation. None of them sanction, or suggest even, the
right to inquire into the past history of the plaintiff for the
purpose of enlightening the jury as to her susceptibility to
mental suffering. As to such susceptibility the question for
the jury in this, as in any other similar case, is whether such
a libelous publication as is complained of was such as would
naturally occasion mental suffering to an ordinary person
occupying the same position as plaintiff did at the time the
libelous article was published. Individuals are of different
temperaments, emotions, and susceptibilities. Whether one
under given circumstances would be more susceptible to mental
pain than another is purely a metaphysical question. In the
administration of human justice there exist no psychological
scales whereby capacity for mental pain can be measured.
A life history itself could furnish no criterion, for a history
which in one would render him acutely susceptible to mental
suffering from defamatory accusation would with another pro-
duce no such result. The law will not permit the defendant,
upon the theory of determining his susceptibility to suffering,
to go into the life history of a plaintiff and present it in detail
before a jury. Capacity for mental suffering cannot be de-
termined from such a detailed history; it is too indefinite and
uncertain; there are no scales of justice capable of measuring
it, and practically it can only be determined by the jury from
a consideration of the susceptibility, in general, of the average
person to mental suffering.

5. It was not error for the court to admit evidence of the
value of the property of defendant. Evidence of that charac-
ter is admissible where exemplary damages are claimed, and
we do not understand the rule is any different whether the
defendant is a corporation or an individual. (*Barkly* v. *Cope-
land,* 74 Cal. 5, [5 Am. St. Rep. 413, 15 Pac. 307] ; *Greenberg*
v. *Western Turf Assn.,* 140 Cal. 358, [73 Pac. 1050].)

We do not understand appellant to seriously question this
rule, but only to insist that under the pleadings, proof of
exemplary damages was inadmissible. As we have already

disposed of this point adversely to that contention nothing need further be said on the subject.

6. Neither was it error to deny appellant the right insisted on of showing that certain matter derogatory to plaintiff was eliminated by the city editor of defendant from the article prepared by the reporter before its publication. The reporter testified that the matter eliminated from his report of the interview with Mrs. Leavitt reflected on the plaintiff and was derogatory of her. We think this was as far as appellant was entitled to go. The reporter testified to his entire interview with Mrs. Leavitt, upon whose statement the article was prepared, so the jury had the benefit of all she had to say relative to plaintiff and could, therefore, judge of what was left out. Neither do we think that slanderous portions of a particular article which are eliminated before the article is published are ever admissible on the question of malice. It does not tend to show a want of malice that the publisher did not charge in a slanderous article as much derogatory matter as the article before publication originally contained.

7. It is claimed that there was prejudicial misconduct on the part of the attorney for plaintiff, and error committed by the court in rebuking counsel for defendant. This is predicated on proceedings occurring during the trial. On Monday, December 22, 1902, at 10 A. M., following an adjournment of court to that date and hour, counsel and the jury being present, and the further trial of the cause being about to proceed, one of the counsel for plaintiff, Mr. Andrews, stated to the court that he desired to call the attention of the court to a partial report in the Los Angeles Times of proceedings supposed to have occurred during the session of the court on the preceding Saturday; and in that behalf stated that accommodations in court had been provided for the reporters of the various papers, including the Times correspondent, and that while no objection could be conceived of their right to report the testimony which had been submitted to the jury by the court, he considered that they had transcended the bounds of propriety when they published matter which had not been read to the jury or which would probably be excluded by the court should it be presented; that without reading the publication he desired to call the attention of the court to part of the report in the Los Angeles

Times, and to request the court to take such steps in the matter as it deemed appropriate under the circumstances.

Counsel for defendant objected to the court taking up the matter at that time as not a proper proceeding; that if any offense had been committed it was not committed in the presence of the court, and the code provided, under such circumstances, a method for presentation of the matter to the court, which was not being pursued.

The court agreed with counsel for defendant, and suggested that, if the counsel for plaintiff wished to pursue the matter he would give them an opportunity to present it during the noon recess; that he did not think it proper to take it up in the presence of the jury. Counsel for plaintiff then stated that he presented the matter not to call the attention of the jury to the publication, but to request that the jury be interrogated as to whether or not they had read the publication; to ascertain if it has had the effect on the jury which he believed "was intended by the defendant." Exception was taken to these remarks by counsel for defendant as constituting misconduct. The court thereupon promptly instructed the jury that they were not to heed any remarks of counsel, nor any statements or expressions of belief as to any matter which might transpire on the trial outside of the courtroom; not to be influenced in the least degree by any remarks which counsel may make in argument, or by way of suggestion, or in any other way. Subsequently, during argument upon the right to interrogate the jury as to whether they had read the article purported to have been published, and in response to the objection of the attorneys for defendant that it was not proper to interrogate them as to whether they had violated their duty or not, counsel for plaintiff replied that he had not assumed any juryman had violated his duty; that he had no thought of that kind, but he simply "wanted to know whether or not defendant had succeeded in getting to the jury information that ought not to go to it." The jurors were then, by permission of the court, interrogated as to whether they had seen the published report referred to, and declared that they had not. After the first juror had been interrogated and had answered, Mr. Shortridge, one of the counsel for defendant, objected to the whole proceeding, and specially

objected to the conduct of counsel "as misconduct which is calculated to be and is prejudicial to defendant and known to counsel to be improper." At the conclusion of his objection the court stated to him, "That is not a remark you should make, Mr. Shortridge; it is improper language."

This statement of the proceedings presents the points made by appellant.

As to the rebuke of counsel by the court. It is couched in courteous language, and was warranted by the improper statement of counsel for defendant that the attorneys for plaintiff knew that they were guilty of misconduct in the proceeding they were taking. It is reprehensible for an attorney to pursue a course before a court with the knowledge that it is misconduct on his part to do so. There is no claim made here, and from the record none could be, but that counsel for plaintiff was proceeding in good faith, and with the sanction of the court, to ascertain solely whether the jurors had read the article in question, and, while the counsel for defendant had a right to object that their action in that regard constituted misconduct, he had no right to charge them with knowledge that the course they were pursuing was an improper one. In the heat of forensic controversy, arguments and objections made by the most courteous attorneys to meet points or rulings suddenly presented, may unwittingly contain language or expressions which they would not use if more deliberately presented. This probably was the case at bar, but this could only furnish an excuse for the use of the language. It could not affect the right of a court to rebuke counsel for indulging in it.

Now, as to prejudicial misconduct on the part of counsel for plaintiff. This is based on the remarks of counsel in discussing the action to be taken by the court, and the right of plaintiff to interrogate the jury on the publication. It is claimed that these remarks amounted to a statement that defendant was seeking to indirectly and improperly influence the jury through illegitimate channels, and that such remarks were calculated to and naturally did prejudice the jury against the defendant.

Undoubtedly when conduct upon the part of counsel produces this result, or naturally or reasonably tends to do so, it will constitute misconduct warranting a new trial. The

mere fact, however, that the action of counsel is improper will not suffice. It rarely occurs in any case which is of moment and sharply contested that counsel on both sides in their zeal and partisan devotion to their clients do not indulge in arguments, remarks, insinuations, or suggestions which find neither support in, nor are referable or applicable to the testimony, or warranted by any fair theory upon which the case is being presented. If such impropriety of counsel always afforded ground for a new trial, there would be little prospect of any litigation becoming finally determined. It is only when the conduct of counsel consists of a willful or persistent effort to place before a jury clearly incompetent evidence, or the statements or remarks of counsel are of such a character as to manifest a design on his part to awake the resentment of the jury, to excite their prejudices or passions against the opposite party, or to enlist their sympathies in favor of his client or against the cause of his adversary, and the instructions of the court to the jury to disregard such offered evidence or objectionable remarks of counsel could not serve to remove the effect or cure the evil, that prejudicial error is committed. It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have. Conceding, as it must be conceded, that it was improper for counsel for plaintiff in addressing himself to the publication to have stated in the presence of the jury his belief as to the intention of defendant relative to it, or that it was the purpose of counsel to ascertain whether defendant had succeeded in getting information to the jury which should not go to them, still these remarks did not constitute that degree of impropriety that its effect must have been so indelibly impressed on the minds of the jury that the instruction of the court to disregard them was ineffectual. The publication had not been read by any members of the jury; nor were its contents declared to them during the proceeding relative to it, counsel in fact disclaiming any intention of doing so. No statement of fact concerning it was made by counsel; he stated only his purpose in calling the attention of the court to it, and

expressed his opinion as to the object of the defendant in publishing it. There was nothing in the remarks of counsel so improper that the prompt action of the court in directing the jury not to heed or be influenced in any degree by them did not remove the effect, if any, which in the absence of such instructions might be claimed to have been prejudicial.

8. It is claimed that the court erred in excluding evidence offered by defendant as to the treatment of Mrs. Neirsheimer at the institution of plaintiff at Point Loma. She is mentioned in the published article complained of.

The evidence was offered by defendant, and error in its exclusion is predicated upon the theory that the answer pleaded justification of the alleged libel relative to the treatment of Mrs. Neirsheimer by plaintiff.

But is is clearly apparent from an examination of the answer that no such plea was made. If anything, there was an attempt to set up a plea in mitigation as to this charge in the published article. The answer stating a separate defense in three subdivisions set forth that "defendant for further answer to plaintiff's complaint in mitigation for the publication of the article complained of alleges." In subdivision 2 the facts relative to Mrs. Neirsheimer are stated, being in effect that before the publication of said article her husband, an officer of the Universal Brotherhood residing at Point Loma Homestead, was under the influence and domination of the plaintiff; that Mrs. Neirsheimer was not a believer in the doctrines taught and the practices indulged in by plaintiff and her said husband, and that Mrs. Neirsheimer, through the influence of plaintiff, was cut off from the usual and ordinary association and communication with her husband, was not allowed to eat at the same table with him, and that such was the husband's infatuation with the teaching and practices of plaintiff at said Homestead that he informed his wife that, if she did not accept his beliefs and obey his orders he would drive her out in the world alone; that on account of the interference and influence of plaintiff over the husband Mrs. Neirsheimer saw him only on such occasions as pleased him to be seen by her; that she was falsely reported by plaintiff and Neirsheimer and his friends to be crazy and dangerous, and

was secretly watched and spied on and accused of lying and
duplicity; that other members of the Universal Brotherhood
were by plaintiff, or at her instance, warned against having
anything to do with Mrs. Neirsheimer.

Then immediately follows this allegation: ''That the fore-
going facts before the publication of said article by the de-
fendant had been communicated by said Mrs. Neirsheimer
and others to divers and sundry persons in the city of San
Diego, and that the same had become and were matters of
public notoriety in said city of San Diego.''

The answer then proceeds in subdivision 3 to specifically
set forth other charges made in the article published, and
pleaded in justification of their truth, but nothing is said as
to the charge concerning Mrs. Neirsheimer.

In subdivision 2 of the answer, just referred to, charging
the facts relative to Mrs. Neirsheimer, there is no allegation
that the matters charged in the libel were true. And from
an examination of the facts alleged in the subdivision of the
answer referred to it is apparent that they do not constitute
a plea in justification. The sting of the libel relative to Mrs.
Neirsheimer in the article published was that she was by
plaintiff forcibly separated from her husband, who was in
the clutches of plaintiff, and was not allowed to speak to him;
that she was forced to live alone in a little tent in the grounds
that surrounded the crazy institution. The facts stated do not
meet the gist of the libel. They do not amount to an allega-
tion that in truth force of any kind was used by plaintiff;
that Mrs. Neirsheimer was forced by plaintiff to live apart
from her husband or forced to occupy a tent upon the grounds.
Several facts are alleged of offenses other than the published
article charged relative to Mrs. Neirsheimer, but nothing is
alleged meeting the sting of the libel. It is laid down that,
in order to constitute a sufficient plea in justification, ''the
justification must always be as broad as the charge and of
the very charge attempted to be justified.'' (Townsend on
Libel and Slander, sec. 212.) This rule is too familiar to
need further citation. While it is not necessary to justify
every word of a defamatory charge, still the plea must meet
the substantial imputation—the sting of the charge—as an
ordinary reader of the article would understand it to have
been made. This plea does not do so.

As it was neither alleged directly nor in effect that the charge relative to plaintiff's treatment of Mrs. Neirsheimer was true, the plea was insufficient as a justification, and must be treated, as the answer declared it was interposed, as a plea in mitigation.

But as a plea in mitigation it is radically insufficient. In order to have constituted a good plea in mitigation it was necessary for the plaintiff to have alleged and proven that it had knowledge of the facts set up in mitigation prior to the publication of the article from reliable sources, or had ascertained them after due investigation and believed them to be true. (*Wilson* v. *Fitch,* 41 Cal. 363; *Barkly* v. *Copeland,* 74 Cal. 3, [5 Am. St. Rep. 413, 15 Pac. 307]; *Edwards* v. *San Jose P. and P. Society,* 99 Cal. 437, [37 Am. St. Rep. 70, 34 Pac. 128].)

Now, the only allegation in this plea is that which we have quoted above,—namely, that Mrs. Neirsheimer and others had communicated the facts alleged in the subdivision of the answer in question to various persons in the city of San Diego, and that they were matters of public notoriety in that city. This did not constitute a good plea in mitigation. It is simply an allegation that there were rumors of the matters set up in the plea. But an allegation of rumors, or proof of them, would not constitute or support a plea in mitigation. (*Wilson* v. *Fitch,* 41 Cal. 363; *Edwards* v. *San Jose P. and P. Society,* 99 Cal. 437, [37 Am. St. Rep. 70, 34 Pac. 128].) It is not alleged that defendant had any knowledge on any rumored matters, or that it ever investigated them, or if so that it believed them to be true and in good faith made the publication of them. In fact, it is not even alleged by the defendant that at the time of the publication it had ever heard of the rumors. Under the authorities, in the absence of such allegations, no sufficient plea in mitigation is stated. As there was no plea in justification, and no sufficient plea in mitigation, the court properly excluded the evidence bearing on the facts set up in this subdivision of the answer.

9. No error was committed in the rulings of the court as to evidence of the general reputation of plaintiff. This was offered to be proven by the depositions of three witnesses taken on behalf of defendant—two in New York and one in Boston. The testimony of the New York witnesses was prop-

erly excluded because they were not shown to have any knowledge of the general reputation of plaintiff in the community in which she resided in New York, nor did the questions indicate what, if any, kind of reputation was being inquired into, whether general reputation for traits of honesty and integrity, or specific traits involved in the action. ·

"Whatever form of inquiry be adopted, the witness must first show his competency to testify by saying whether or not he knows the general reputation of the person whose character is in issue in the given community, and as to the trait or qualification in question." (3 Ency. of Evidence, p. 44.)

The testimony of the Boston witness, also taken by deposition, was properly excluded for the same and another reason. This party, in 1899, went to Newburyport, Massachusetts, presumably from Arkansas, at the request of some friends, and stopped there a few days "to make inquiry as to her [plaintiff's] career there," and talked with some twenty persons about her. Over objection of plaintiff, and as the result of this inquiry, he testified as to the reputation of plaintiff. Such testimony was clearly inadmissible. As general reputation consists of the estimation in which one is held in the community in which he resides, it can only properly and safely be testified to by a member of the community; it is the opinion of a member of a community as to the estimation in which another who moves in it is held generally by that community. Such member has the means of knowing what that general reputation is and can properly speak of it. It would be extremely dangerous to enlarge the rule so as to permit a stranger to a community, entering into it with special bias against another (as this Boston witness showed he was against plaintiff), to testify as to his opinion of the reputation of that other, based upon an interview with a limited number of persons in the community, possibly equally as prejudiced as himself. Under such circumstances it could not be said that he was testifying from his knowledge of the general reputation of the party, or that he was expressing his own opinion on the subject. He would be but stating his conclusion from the statements of others, derived from specific inquiry—a conclusion which would amount to but hearsay evidence at most. (*State* v. *Forshner*, 43 N. H. 89, [80 Am. Dec. 134]; *Douglass* v. *Tousey*, 2 Wend. 352, 20 Am. Dec. 616].)

10. As to the instructions. No particular instruction of the court to the jury is specifically complained of. It is insisted, however, that the general tenor and temper of the charge of the court disclosed a bias in the mind of the court against the cause of defendant. It is not claimed that there is any particular instruction which supports this contention, but the claim is that, taking the trend of the instructions as a whole, it indicates it. We perceive no valid basis for this complaint. The instructions of the court were clear, concise, and correctly stated all the law applicable to the issues involved. It is true that in declaring what issues were before the jury, the court also stated that certain other issues were not involved. Ordinarily it is sufficient for the court to instruct a jury as to the law applicable to the issues involved, but it by no means follows that a court is precluded from calling their attention to matters which are not involved, or that it is improper to do so. Excerpts in the transcript from the argument of one of the counsel for defendant to the jury show that he insisted that various issues were before the jury for consideration and determination with which it is very clear they had nothing to do, and which were not involved in the case. The court instructed the jury specifically that these were not issues and that they should not be considered in their deliberations. This was entirely proper.

11. There are other points made on this appeal, all relating to alleged errors on the part of the court in the exclusion of evidence offered on the part of defendant in support of the truth of the charges made. We do not think they merit particular discussion. We have examined them carefully, and are satisfied that the rulings of the court in rejecting the offered evidence were correct. Much of it was inadmissible because there was no particular justification pleaded to which it could be addressed, and the rest of it was immaterial to any issue involved in the case.

The judgment and order appealed from are affirmed.

Shaw, J., Angellotti, J., Henshaw, J., McFarland, J., and Sloss, J., concurred.

Rehearing denied.