[Civ. No. 10273. Third Dist. Aug. 15, 1963.]

THE PEOPLE ex rel. THE DEPARTMENT OF PUBLIC WORKS, Plaintiff and Respondent, v. JOHN LILLARD et al., Defendants and Appellants.

Desmond & Miller and John M. Welsh for Defendants and Appellants.

Holloway Jones, Jack M. Howard, Thomas F. Vizzard, Francis A. McEnaney, William R. Edgar, Robert E. Reed,

Joseph F. DeMartini and Roger Anderson for Plaintiff and Respondent.

PIERCE, P. J.—Defendants, dissatisfied with a jury award in condemnation, appeal.

They are the owners of 300-odd acres of farm land adjoining U.S. Highway 40 (Sacramento to San Francisco) on the south. Their place (hereinafter "the Lillard" place or property) is located approximately one-half mile east of Richards Boulevard, described as the "feeder" street from the highway into Davis.

Prior to October 1958 the portion of U.S. 40 involved was a 4-lane limited access freeway. Commencing on that date it was being converted into a 6-lane freeway with no access except at designated interchanges.

In the "before" condition, along the 3,900 feet of highway frontage the Lillard property had access to the highway at three locations where vehicles could enter the eastbound lane of travel, one 30 feet in width located at the northwest corner and shared with the neighbors on the west, the second located 1,500 feet to the east, also 30 feet wide. In addition, the Lillard property's east boundary is County Road 103 and access to the highway was provided at the northeast corner of the property where this county road intersected the highway. The 4-lane freeway was divided by a strip separating the eastbound and westbound lanes. At the two easterly accesses vehicles could cross the highway and join the westbound traffic. The state, however, had the right to close the median strip to travel, preventing this. The Lillard property was 3½ to 4 feet below the elevation of the highway. It was county-zoned "agricultural" but the property adjoining to the west is zoned "commercial" to a depth of 400 feet from the highway.

The purpose of the condemnation proceeding was to acquire a strip along the north boundary of defendants' farm, comprising 15.51 acres, to widen the highway and provide a frontage road. These 15.51 acres are unimproved except for farm fences and two highway signs.

Also condemned was the right of direct access to the new freeway which, when completed, would be fenced off. Instead a frontage road paralleling the freeway was being provided. It would extend from an interchange at Richards Boulevard on the west to (and beyond) an interchange on the

east at County Road 104. This interchange is approximately a mile to the east of the northeast corner of the Lillard property. Both these interchanges are so designed that access to the freeway can be had for both eastbound and westbound travel, also for travel across the highway and (at the westerly interchange) into Davis via Richards Boulevard; also (at the easterly interchange) above the Southern Pacific Company tracks and then either northerly along said county road 104 or easterly and westerly along County Road 32 which parallels the railroad tracks. (Traveling westerly, this road also runs into the City of Davis.)

Defendants' appraiser, the late Mahlon Small, fixed the market value of the 15.51 acres of land being taken at $85,300 ($5,500 per acre) and the severance damages to the remainder at $61,550, a total of $146,850. He reached the severence damages through the process of depreciating 19.24 acres adjoining the condemned land on the south from its asserted "before" commercial value ($5,500 per acre) to its asserted "after" value for residential purposes ($2,300 per acre).

Two other witnesses testified as experts for defendants. One John B. Simmons, a Davis real estate broker, valued the part taken at from $5,000-$5,500 per acre; the other, Don Miller, placed the value as being "in the vicinity of $5,000 an acre." Neither testified to any sum for severance damages. (Simmons wasn't asked and Miller disclaimed his qualification to fix the amount of severance damages, although testifying there would be some.)

The jury awarded defendants $24,816. This was exclusively for the acreage taken. Nothing was awarded for severance damages. In fact the jury's finding was that special benefits to the part not taken were $32,000.

In making this award the jury obviously accepted the theory of the state's appraisers which may be summarized as follows: that the growth of the City of Davis had been in the past to the northwest, expansion southerly and southeasterly having been interfered with by the Southern Pacific Railroad tracks and by the heavy flow of traffic on U.S. 40 paralleling it. With the creation of the two interchanges at Richards Boulevard and County Road 104 and construction of the frontage road, these "barriers," the appraisers said, would be overcome and a new metropolitan growth in this southeasterly direction was to be expected. The highest and

best use in the "before" condition was stated to be agricultural but with the knowledge that highway change described above was coming there was "a higher and more speculative use" particularly with regard to the 400-foot frontage along the new frontage road. The value of the land taken as fixed by the jury was the highest of the three state appraisals (that of Burle Howell) and the jury also accepted his estimate of special benefits.

Substantial evidence supported the award and defendants do not contend otherwise. Their ground of appeal expressed with most fervor and vehemence is an asserted prejudicial misconduct by the trial judge

Our study of this contention has involved a painstaking review of a transcript of four volumes (904 pages). It has frequently been observed that a trial judge's remarks *taken out of context* can assume a meaning or import neither intended nor justified when read *in context*. (See e.g., *Martin* v. *Pacific Gas & Elec. Co.*, 204 Cal.App.2d 316, 324 [22 Cal.Rptr. 291], hearing by Supreme Court denied.) The observation is appropriate here.

The statements of the court to which defendants take exception came during the cross-examination of one of the state's appraisers. The court interrupted to ask Mr. Miller, attorney for defendants, whether the defense contended there would have been a "steady strip of commercials on the freeway" but for its conversion into a nonaccess freeway. Counsel replied that such *was* his contention. In a discussion between the court and the attorney which followed, reference was made by the latter to two establishments on U.S. 40, The Nut Tree and the Milk Farm, with direct highway access. The following colloquy then occurred.: "COURT: When he goes to come out of there, he can only go one way when he gets out. The same direction as he was going, doesn't he? If he was going east on there, and the commercial is on his side of the highway, he has to continue to go east. MILLER: This is in the before condition? COURT: I am talking about ——— MILLER: If he goes east, he still continues to go east. COURT: That's right. Suppose he is going to a football game and he or his wife forgot their tickets. That's one instance. He has to go back and get them, but he has to go on until he can get back in the opposite direction. A frontage road isn't a one way road, is it? MILLER: No. COURT: He can go either way. It is a benefit to both. Secondly, I can see

this situation. He can always get in there very easily, but if there is heavy traffic like in some parts of the State of California where cars come bumper to bumper, when he goes to come out of that access, he could be able to save time by going down his frontage roads to another place where he could get back onto the highway. The people travelling down the main road have the right-of-way? MILLER: You asked me, and I would say you made a conclusive closing argument on behalf of the plaintiff that such is a benefit, and the jury will listen to the court, and so we are stuck with benefits, but I will answer with this fact—that it is very harmful to Mr. Lillard. . . .''

We do not read into the court's statements the meaning which defense counsel's last quoted remark gives to them. To us the judge was saying that a motorist attempting to reenter a direct access freeway was at a disadvantage in having to await an opportunity if traffic is heavy; also disadvantaged by having to travel in one direction until an opening in the median dividing strip permits a U-turn. The frontage road—with interchange-type of freeway, he stated, permits travel in both directions. Thus construed, what he says is a truism. It expresses merely an advantage to a through-traveling motorist which no defense witness did, could, or would gainsay. On the question at issue, i.e., whether the value of the remainder of the Lillard property was damaged or specially benefited by the freeway conversion, the court expressed no opinion. Defendants' counsel in interpreting the court's statement as an opinion of special benefit to the lands does so with an oversensitive ear.

■ The judge is obligated to conduct the trial in a fair and impartial manner. (*Etzel* v. *Rosenbloom*, 83 Cal.App.2d 758 [189 P.2d 848].) He may not, of course, choose sides. His function, however, is much more than that of a plate umpire at a baseball game calling balls and strikes. (*People* v. *Golsh*, 63 Cal.App. 609, 614-615 [219 P. 456].) In *People* v. *Rigney*, 55 Cal.2d 236 [10 Cal.Rptr. 625, 359 P.2d 23], the court quoting an earlier case (*People* v. *Corrigan*, 48 Cal.2d 551, 559 [310 P.2d 953]) said, on page 241: ''Indeed, 'it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence.' '' The opinion (by Justice Traynor) in the *Rigney* case, *supra* (at pp. 241-244), is a treatise on the subject of judicial propriety as applied to the trial judge. We

cite it but conserve space by refraining from quoting or paraphrasing here.

 We have examined the cases cited by appellants: *Iloff* v. *Purity Stores, Ltd.,* 178 Cal.App.2d 1 [2 Cal.Rptr. 735]; *Forte* v. *Schiebe,* 145 Cal.App.2d 296 [302 P.2d 336]; *Etzel* v. *Rosenbloom,* 83 Cal.App.2d 758 [189 P.2d 848]; *Steele* v. *Wardwell,* 57 Cal.App.2d 642 [135 P.2d 628]. We find them, on their facts, not applicable. In all of them the trial judge prejudged, chose sides and let the jury know he had done so. That was not done here.

Our examination of the record establishes to us that the judge throughout the trial exhibited more than a usual patience and restraint. The trial lasted from March 21, 1960, through April 5, 1960—although but one parcel was involved, the issues were comparatively simple, and each side produced but one principal and two supplementary experts. These experts (on both sides), taking full advantage of the latitude of expression permitted by *County of Los Angeles* v. *Faus,* 48 Cal.2d 672 [312 P.2d 680], and by Code of Civil Procedure section 1845.5, gave reasons and drew comparisons in support of their several opinions which were fulsome and uninhibited. As generous in coverage as the direct examination had been, the cross-examination (again as conducted by both sides) was even broader. It was also tedious and repetitive, a single item being ruminated again and again. Notwithstanding, the trial judge was tolerant. He was also impartial. Flights of fancy by witnesses and counsel were rarely "grounded" but when the judge was forced to bring the proceedings back within the issues remonstrances were impartially directed both to plaintiff's and defendants' counsel. The judge comported himself judiciously and fairly. We find no misconduct.

Moreover, the judge gave careful instructions to the jury in this regard. Three separate and explicit instructions may be summarized as follows: The jury was told that it was its duty, unaided by any suggestion from the court, to pass upon all questions of fact; that the judge had intended to express no opinion favoring the claims of either party and that if any statement made by him had seemed to indicate that he had formed any opinion, the jury was instructed to disregard such statement.

Even if we were prepared to concede, which we cannot, that the remarks made by the trial judge here were of doubtful propriety, they could not be said to have been so serious that

their effect was not erased by these admonitions. (*Richman v. San Francisco etc. Ry.*, 180 Cal. 454 [181 P. 769]; *Barboza v. Pacific Portland Cement Co.*, 162 Cal. 36 [120 P. 767]; *Germ v. City & County of San Francisco*, 99 Cal.App.2d 404 [222 P.2d 122].) ▇ It must be assumed the jury possessed ordinary, intelligence (*Beeks* v. *Joseph Magnin Co.*, 194 Cal. App.2d 73, 78 [14 Cal.Rptr. 877]) and that they followed the instructions. (*Nunneley* v. *Edgar Hotel*, 36 Cal.2d 493, 500 [225 P.2d 497]; *Lynch* v. *Birdwell*, 44 Cal.2d 839, 848 [285 P.2d 919].)

▇ Defendants also contend they were prejudiced when the judge referred to U.S. 40 as being a ''one-way highway.'' The judge, however, was obviously referring to the separate lanes of travel and not to the freeway as a whole. The jury could not have been misled.

▇ Defendants' next contention relates to an objection sustained by the court to a question asked defense witness Don Miller relating to lot values.

The witness had put on a subdivision of 48 lots near the Lillard property on the east. He testified that he had bought the land for this subdivision (28.16 acres) at $1,775 per acre. He testified that after subdividing he had sold 12 of the lots and defense counsel asked him at what price. An objection was made and defense counsel advised the court he proposed to follow the answer to that question by asking the witness to testify to the ''per-lot'' cost of putting on the subdivision. Deducting this the net lot value would be determined. This would then be a comparable sale under *County of Los Angeles* v. *Faus*, 48 Cal.2d 672, *supra*. He cited *Napa Union High School Dist.* v. *Lewis*, 158 Cal.App.2d 69 [322 P.2d 39], as authority for the admissibility of such evidence. That case did not deal with comparable sales. Any discussion here, however, of applicability of the rule or reasoning of *Napa* would be improper—for the reason that the record clearly shows (and appellants' brief is silent as to this) that after the court had reserved ruling and had taken the matter under consideration for more study and had thereafter announced its readiness to rule, defense counsel *expressly withdrew the question*. (*People* v. *Temple*, 102 Cal.App.2d 270, 279 [227 P.2d 500].)

▇ Defendants' next contention is that the court prejudicially sustained an objection, on the cross-examination of plaintiff's witness, Walcott, an assistant right-of-way agent

of the Division of Highways, to the following question: "Q. For the past ten years, the freeway has been threatening to take those access openings and condemn more property, haven't they, since they finished the original freeway?" Objection was made upon the ground that counsel was assuming facts not in evidence. The court sustained the objection because the question was too speculative. Counsel explained his reason for asking the question was that the witness, earlier during the cross-examination, had testified that in the "before" condition, with access openings existing for seven years there had been no commercial development in the area of the Lillard property.

Properly framed and with a foundation-laid inquiry, cross-examination of an adverse witness on this subject would have been proper. Although there appears to be a conflict of authority on whether "market value" is still the yardstick of just compensation when it is established that a depressed market for the property is created by a proposed condemnation (see 1 Orgel on Valuation Under Eminent Domain, p. 449), at least one California case has said that the trial court "could have, within the limitations of sound legal and equitable principles, advised the jury that they should treat the property as having the value that it would have had, had no preliminary action been taken by the board toward the acquisition of the property." (*Buena Park School Dist.* v. *Metrim Corp.*, 176 Cal.App.2d 255, 259 [1 Cal.Rptr. 250], hearing by Supreme Court denied.)

There had been in the case at bench, however, no evidence of a threatened condemnation nor of a depressed market caused thereby. Defendants' evidence was that Lillard's farm land was prime commercial property. Plaintiff's witnesses had testified that conversion of the freeway as planned would *not* depress but would enhance market value. The question as framed *assumed* a threat by the state for 10 years to convert the freeway. There was no proof of this and no offer of proof. Under these circumstances the court's ruling was proper. In McCormick on Evidence (Hornbook Series) page 12, the author says regarding "argumentative" questions:

". . . A still more common vice is for the examiner so to couch the question that it assumes as true matters to which the witness has not testified, and which are in dispute between the parties."

We will comment on this rule further below.

We pass to defendants' next contention:

■ To answer plaintiff's testimony that the Lillard property would benefit by the freeway conversion, defendants' rebuttal witness, Esther Fernandez,· testified that when conversion of a portion of the freeway, U.S. 99 between Stockton and Sacramento, had occurred along a certain 6-mile stretch, the businesses theretofore existing had been closed. Although she did not so state, the inference was clear that they had been forced to close by loss of business. On surrebuttal, Gilbert Mulcahy, district right-of-way agent of the Division of Highways, was called. He testified, on direct examination, that the reason for the closing of all of the businesses except two was that the state had bought the property.

A long cross-examination was conducted. Mrs. Fernandez had mentioned 51 businesses. Mulcahy had listed 15. (The discrepancy was at least partly due to a difference of opinion as to what businesses were to be considered as being freeway-influenced.) Mulcahy modified his testimony to state that ''a great majority'' of the properties had been acquired by the state.

Cross-examination continued, It appeared that defense counsel proposed to examine in detail regarding each business establishment in the 6-mile area. The court, having asked counsel his purpose, was told ''[s]ome of those people still own their property but they haven't gone back into business.'' The court answered, ''That's a different matter. If you want to prove that, that's perfectly proper.'' In the questioning which ensued, however, no such proof developed and after the witness had been examined regarding 32 different parcels, the court stated it was going to shut off the cross-examination as it wasn't ''going to get any place.'' Defendant urges this as prejudicial error. We regard the court's statement as accurate.

The trial was then already approaching the close of its second week. The inquiry concerned properties located many miles distant from the property being condemned and on another highway with no very close similarity of situation having been shown between the two.

■ The right of cross-examination is not unlimited. Like other incidents of the trial, it is subject to proper and reasonable control by the trial judge to see that the trial is conducted expeditiously. (*Martin* v. *Los Angeles Ry. Corp.*,

75 Cal.App.2d 744, 750 [171 P.2d 511]; *People* v. *Corlett*, 67 Cal.App.2d 33 [153 P.2d 595, 964].) ▮ A trial judge has a wide discretion in order to keep examination within reasonable bounds.

". . . When an appellate court is called upon to decide whether such discretion has been abused, the inquiry is whether a sufficiently wide range has been allowed to test such credibility and weight rather than whether some particular question should have been allowed." (*People* v. *La Macchia*, 41 Cal.2d 738, 743 [264 P.2d 15].)

▮ Similar observations to those stated above may be made to defendants' contention that the court erred in sustaining objection to a question during the cross-examination of plaintiff's witness Walcott, relating to the effect of bypassing the town of Arbuckle by a freeway: "Q. And when that was bypassed so you had to go through Arbuckle by turning right at the school or north by the service station to get to the main street of Arbuckle, didn't you learn that the service stations and restaurants closed and business dropped 50% including one who had been there since he finished school— Pierce Wertz? VIZZARD [Plaintiff's counsel]: Is this frontage road or bypass? MILLER: It is where you take it right through the town of Arbuckle, one block away. Q. Did you know their business dropped 50% and some went broke and closed up? COURT: Do you know it? You are assuming something not in evidence and you have been doing that from the start. You don't know what is happening in Arbuckle. There is no evidence of it."

These "did you know that" questions designed not to obtain information or test adverse testimony but to afford cross-examining counsel a device by which his own unsworn statements can reach the ears of the jury and be accepted by them as proof have been repeatedly condemned.

▮ In *McDonald* v. *Price*, 80 Cal.App.2d 150 [181 P.2d 115] (hearing by Supreme Court denied), the court states at page 152:

"While a wide latitude should be given in cross-examinations, counsel in putting questions to the witness should not be allowed to assume facts not in evidence and state as positive assertions facts which if true would be detrimental to the opposing party's case and of such a nature as to inflame and prejudice the minds of the jurors. . . . The inherent vice of the matter lies in the attempt to bring before the jury in a

round about way facts which could not be proved. . . ."

In the recent case of *People* v. *Hamilton,* 60 Cal.2d 105, at page 116 [32 Cal.Rptr. 4, 383 P.2d 412], our Supreme Court condemned and characterized as misconduct questions which are asked "for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given."

The court's voluntary stopping of the line of questioning pursued by defense counsel in this regard was proper.

 Defendants have made several contentions attacking the court's instructions, only one of which requires notice. The court, after having fully and accurately instructed the jury as to what severance damage was, how to determine whether it exists and the rules applicable to its measurement then gave an instruction (apparently unrequested) in which it included the following: "[I]f you find that the remainder of the defendants' property in this case is damaged, then you will consider and go by these instructions on severance damages [theretofore given], but if you find there is no severance damage, I have to give you those instructions, and I do give them to you. If you find there is severance damage, you follow them, but if not, they are harmless and don't mean anything to you. Get the idea?"

The statement was inartificial and, strictly construed, somewhat inaccurate. In context we think it clear the statement was intended merely to advise the jury that the instructions on how to determine and fix the *amount* of severance damages were to be applied if the jury, from the evidence, found the *existence* of severance damages under the court's other instructions. When the instructions are read as a whole the jury could not have been misled. (*Sebrell* v. *Los Angeles Ry. Corp.,* 31 Cal.2d 813 [192 P.2d 898].)

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.