[Civ. No. 11088. Third Dist. Apr. 29, 1966.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. AUBURN SKI CLUB et al., Defendants and Respondents.

Harry S. Fenton, John B. Matheny, Edward J. Connor, Jr., and Peter F. Elkind for Plaintiff and Appellant.

Desmond, Miller & Desmond, James K. Norman, Richard E. Good and E. Vayne Miller for Defendants and Respondents.

PIERCE, P. J.—In this condemnation proceeding respondents received a jury award of $201,050. After judgment entered and the trial court's denial of a motion for a new trial the state appealed.

Its contentions will be captioned below and discussed after a general statement of the facts.

The land condemned was a "total take" of 65.8 acres of land located at Cisco Grove in Placer County. A comparatively small portion was needed for the construction of a section of the new freeway between Auburn and Donner Summit. (Interstate Highway 80.) The state, however, elected to take the entire parcel under Streets and Highways Code section

104.1,[1] since the remainder would have been entirely land-locked. The parcel is mountainside property lying between the Yuba River which forms its north boundary and the Southern Pacific Company railroad right-of-way, its south boundary, which is several hundred feet in elevation above the stream. From the south boundary the property slopes downward at varying grades of steepness to a flatter area along the river. Old United States Highway 40, which ran generally along the north side of the river, is not immediately adjacent thereto but the property had access to the highway; in summer via a private road on the property leading to a county road which joined the highway, and in winter via a footbridge across the river and along a path to a parking area adjoining the highway.

The Auburn Ski Club had acquired the property under a lease in 1928 and had bought it in 1933. It had been used for many years as a ski jumping and skiing resort. It was improved with a lodge, appurtenant buildings and skiing facilities, which included an Austrian type Kuhn lift, a Poma lift and a rope tow.

At the time of the acquisition by the state in 1961 the property was being leased to defendant Snow Shoe Corporation. By stipulation the case was presented to the jury without it having to distribute the award between owner and lessee. The market value was computed as of 1963. Other facts will be developed in the discussion of the points urged by the state on appeal.

### 1. Re the Contention that the Court Improperly Allowed the Jury to Consider two Small Area Sales as "Comparables."

Of 10 sales of properties offered by the condemnees as "comparables" (all objected to by the state), the court allowed two—a sale ("Mariano to Fox") of a parcel 66 feet by 185 feet in size, purchase price $3,500, and another ("Mariano to Rachiel") of an adjacent parcel 62 feet by 100 feet in size. The latter had been sold for $3,000. It is urged that this was a comparison of the market value of "raw" acreage

---

[1]Streets and Highways Code section 104.1 provides as follows: "Whenever a part of a parcel of land is to be taken for State highway purposes and the remainder is to be left in such shape or condition as to be of little value to its owner, or to give rise to claims or litigation concerning severance or other damage, the department may acquire the whole parcel and may sell the remainder or may exchange the same for other property needed for State highway purposes."

with lot sales and therefore impermissible. We have concluded that because of the somewhat singular circumstances existent and the limited purposes for which the two sales were used, the trial court did not abuse its discretion in permitting such use. We explain our conclusion:

The condemned property was unique in character and none of the sales used by either side as ''comparables'' bore a too-close similarity to it. The description given above will suggest the reasons for this and the testimony of all the witnesses emphasized these reasons. Nevertheless, the two Mariano sales were of mountain homesites, along the same stream, not too far distant from the subject property, usable both during summer and winter, easily accessible via the same highway to all the Tahoe forest ski areas, all of which were features these properties had in common with a substantial portion of the property being condemned. According to the state's witnesses, 23 acres thereof had *some* value for homesite development. The condemnees' experts testified that the highest and best use of from 10 to 13 acres of the subject property fronting the river was for summer-winter homesites. Characteristically the experts disagreed sharply in their evaluations, being bullish or bearish, depending upon the side for which they were testifying. (The state's witnesses opined that mountain homesites along a river were of little value without other advantages—prominent among which was highway frontage—which the subject property did not have. Condemnees' experts declared that frontage upon the river, plus seclusion from but with ready access to the highway and therefore to all high Sierra ski country, made this prime summer and winter property.[2])

*County of Los Angeles* v. *Faus,* 48 Cal.2d 672 [312 P.2d

[2]It will be convenient to state here the positions of the state and condemnees respectively regarding the rest of the condemned property. According to the state, the property, other than the 23 acres with a limited potential for homesites, was unusable and had no value at all. No buyer, it contended, could be attracted for any commercial skiing enterprise like Squaw Valley, Sugar Bowl, etc., because of the uncertainty of snow at the low elevation, approximately 5,500 feet, and because of its small size. Condemnees' witnesses, on the other hand, pointed to the property's unusual wind protected (and snow preserving) northern slopes, its long history as a private but nonexclusive community type club (with a peak membership of 950); and declared it to be a time-proven winter recreational area featuring both inexpensive family skiing and ski jumping. The latter, it was shown, had attracted experienced jumpers from all over the world. The property had been the site of an international ski jumping meet. The two state experts evaluated the property at $84,850 and $75,000. Condemnees' witnesses' valuations ran from $313,610 to $354,400.

680], overruled earlier California cases and held that comparable sales could be referred to on both direct and cross-examination in condemnation cases. The decision in *Faus* (p. 678) quoting from McCormick on Evidence, section 166, page 348, sets forth certain safeguarding tests for admissibility— nearness in time and locality, similarity in "character, situation, usability, and improvements." We do not construe *Faus*, however, as intending these tests to be inflexible. Also quoted in *Faus* (p. 678) is the statement from McCormick (*op. cit.*); " 'Manifestly, the trial judge in applying so vague a standard must be granted a wide discretion.' "

The court observes in *Covina Union High School Dist.* v. *Jobe,* 174 Cal.App.2d 340, 350 [345 P.2d 78] : "We should not assume that the trial court abused its discretion. In fact the rule is exactly the opposite. [Citations.] "

Citing *City of Los Angeles* v. *Hughes,* 202 Cal. 731 [262 P. 737], and *People* v. *Olsen,* 109 Cal.App. 523, 533 [293 P. 645], as authority for its position, the state argues that since the sale of lands of acreage dimensions for homesites would require compliance with laws and ordinances pertaining to subdivision development the two sales allowed here could not possibly be comparable. The first of the two cases cited (*Hughes*) involved a potential suburban development and the latter case (*Olsen*) a development for town lots. Under the facts there present the holding that testimony of what the owner would be able to get for lots after the property was subdivided is inadmissible certainly cannot be criticized. But we do not equate the facts of the *Hughes* and *Olsen* cases with the facts here, and the differences make the rule stated inapplicable. Because of the peculiar circumstances described above —the *sui generis* character of the subject property and impossibility of obtaining other market data—these considered in the light of the quite considerable areas in which the properties compared possess common features with the subject property, we share the trial court's opinion that the sales permitted to be used would have been helpful to the jury in fixing just compensation and were therefore properly admitted. Moreover, the manner of their presentation to the jury was a sufficient guarantee against their use having had any harmful effect. Witnesses for both parties were careful to note their limited value as evidence; the steps which would have to be taken and conditions met (much simpler than would be the case with city or suburban property) before lots on the subject

property could be sold were fully pointed out to the jury, and we cannot assume it either disregarded or was incapable of understanding the limited purpose of their use as "comparables."

■ The following quotation from the opinion of this court (per Presiding Justice Van Dyke) in *Napa Union High School Dist.* v. *Lewis*, 158 Cal.App.2d 69, at page 73 [322 P.2d 39], although used in a somewhat different context, is apt: "The rules for determining value of land taken by condemnation cannot, from the nature of the case, be inflexible. In each case just compensation is the goal; and where a rigid application of even a settled rule will produce injustice it must be departed from so far as made necessary by the circumstances of the case."

### 2. *Re the Contention that the Court Improperly Rejected the State's Offered Instruction that the Jury Could not Consider Lot Sales.*

■ By its offered instruction number 38 the state sought to have the court instruct the jury it could not consider the prices an owner would be able to obtain on lot sales; that such prices were not *"relevant"* to the determination of market value. The court rejected this instruction.

Rejection was proper. As framed the instruction would have advised the jury to disregard all evidence regarding the Mariano to Fox and Mariano to Rachiel sales, the admission of which was proper as the foregoing discussion has shown.

The court did properly instruct the jury: "You are instructed that you are not to determine the value of the property as if it had been divided into smaller parcels of land, or as lots, but you are only to determine the market value of the property as an entire, unsubdivided tract of land consisting of a total of 65.8 acres in size."

### 3. *Re The Contention that Condemnees' Attorney was Guilty of Prejudicial Misconduct.*

■ The state's principal contention on appeal is that there was a miscarriage of justice because of prejudicial misconduct on the part of condemnees' counsel, the late E. Vayne Miller, and because of the failure of the trial court to keep the trial tactics of said counsel within the bounds of propriety. Many instances of alleged improprieties are cited. Our examination of the record shows that some of the charges are justified, others are not. The same examination reveals that in

misbehavior condemnees' said attorney was well-matched by the state's own attorneys. It also discloses that the trial judge, far from losing control of the case, presided with firmness and complete fairness to the parties to the end that, under extremely difficult and patience-trying circumstances, the jury was enabled to consider the evidence and decide the case fairly.

Before undertaking specific discussion of the state's charges a few general observations may be relevant. It has been noted that but one parcel of property was involved and that the entire property was being taken. No distribution between owner and tenant had to be made. Yet the following court days were consumed: April 14, 15, 16, 17, 21, 22, 23, 24, 28, 29, 30; May 1, 5, 6, 7 and 8, 1964. At the outset of the trial it was obvious that 'bad blood'' existed between the opposing attorneys, or, more accurately, between Mr. Miller and the state's attorneys, and there was much time-consuming sniping between them. Miller was by no means the sole, and perhaps not the prime, offender. Discussion below of some of the state's principal complaints of misconduct may serve to illustrate this.

The first charge of Mr. Miller's misconduct is that in cross-examining a state's witness, John Petersen, he framed questions bringing out that the highway improvements here actually consumed but a small percentage of the total of the property taken. This was not a fact relevant to the sole issue before the jury. In its direct examination, however, the state for reasons not apparent to us had itself brought out this fact in detail, showing the exact location and proportion of the property being used for freeway purposes. Although we may suspect the motives which prompted Mr. Miller in his cross-examination of Mr. Petersen on this point, he was not bringing forth evidence with which the jury was not already familiar. If it was relevant for the state to prove these facts, it would seem equally relevant for Mr. Miller to test the witness' credibility. Also, if there was any doubt in the jury's mind as to the purpose of the "entire" take, Mr. Connor disabused it by making the statement: "I think it is obvious that the access taken here and the landlocking of the remainder made it necessary for the Division of Highways to acquire the entire property." (It will be noted below that state counsel was more critical when Mr. Miller volunteered information to the jury.)

The state's second charge of misconduct charges Mr. Miller

with impropriety in asking questions regarding the status of the Auburn Ski Club as a nonprofit corporation. Objection to the question was sustained and the court then and there instructed the jury that the Auburn Ski Club enjoyed no status different from an individual in the matter of any award to be made as ''just compensation.'' The state insists that the sole thrust of these questions was to influence the jury to award more than just compensation. Such devious purpose is less apparent to us. The position of the state was that the property had no value for skiing. Condemnees sought to prove that its value lay in the fact that it would be marketable to a community-type nonprofit corporation making low-cost skiing and ski jumping available to ski enthusiasts, including large groups of high school students. (See fn. 2, *supra.*) Emphasis of this, thus considered, was relevant. Moreover, previous tactics by the state in the matter of cross-examination of one of the condemnees' appraisers with reference to a sale from Sherritt to L. S. Clegg of property for the ''new'' Auburn Ski Club gave the questions asked by Mr. Miller additional relevancy. We will discuss this below.

The state's next complaint has more merit. Through cross-examination of one of the state's two appraisers, Mr. Miller sought to bring out that one Gilbert Mulcahy of the Division of Highways had placed a higher market value on the subject property than had the witness under examination. The question had had no proper foundation to show its relevancy as impeaching the opinion of the witness; it was objected to and objection was sustained. Mulcahy's appraisal, if any, was never stated. One of the state's attorneys had himself drawn ''return fire'' by commenting improperly that ''it was not true'' that such an appraisal had been made. In the somewhat juvenile colloquy between opposing counsel of an ''it is not true—it is true'' nature which accompanied this incident, we cannot believe that an adult jury had any difficulty accepting and following the often repeated admonition by the court that statements by counsel were not evidence and were to be disregarded.

The state's next assignment of misconduct relates to numerous instances where Mr. Miller employed the ''do you know that'' technique in questions put on cross-examination. The state is correct in its declaration that such technique has drawn sharp criticism from this court *where questions are framed ''not to obtain information or test adverse testimony but to afford cross-examining counsel a device by which his*

*own unsworn statements reach the ears of the jury and be accepted by them as proof."* (Italics supplied.) (*People* ex rel. *Dept. of Public Works* v. *Lillard,* 219 Cal.App.2d 368, 379 [33 Cal.Rptr. 189] ; see also *Love* v. *Wolf,* 226 Cal.App.2d 378, 390 [38 Cal.Rptr. 183].)

Neither time nor space permits us to discuss all of the instances of Mr. Miller's claimed misuse of the "do you know that" technique. Some of the claims are trivial, many are improperly charged. Use of the phrase "do you know that" does not automatically make a question on cross-examination improper. Employment of that or a similar phrase by the cross-examiner as a springboard for improperly bringing unsworn statements by the cross-examiner before the jury as truth is the vice condemned in the cases cited. However, when Mr. Miller informed the jury that during a year of heavy snow the Southern Pacific's train, the "City of San Francisco," had become snowbound, he but stated a commonly-known fact. When he asked one of the state's experts who purportedly had examined many ski resorts at various elevations if the one at Mineral was not at an elevation of 4,690 feet he was only properly cross-examining regarding a readily verifiable matter of geography after the witness had already professed a thorough investigation and knowledge of the subject of minimum elevations at which commercial ski resorts could function.

Both sides cited and relied upon *People* v. *La Macchia,* 41 Cal.2d 738 [264 P.2d 15], as authority for the proposition that the credibility of an adverse witness may be tested on cross-examination regarding other sales of property even though such sales may not be used on direct examination as "comparables." That case also holds, however, that the trial court has a wide discretion to keep this sort of cross-examination within reasonable bounds. Mr. Miller misused the rule in several instances, straying far afield and departing far beyond permissible cross-examination. But in each instance the court sustained the state's objections, and, as stated above, the jury was admonished frequently. The attorneys for the state were themselves transgressors. They too used the device to bring inadmissible sales before the jury. For example, a sale, Sherritt to the Auburn Ski Club, of land at Sierra Crest (acquired apparently as a substitute for the condemned property) was improperly so used. Stating an ostensible purpose to test the credibility of the opinion of condemnees' principal appraiser, the state brought out the acres and price per acre of the sale (after the witness being cross-examined had testified he had no

knowledge of the sale). The condemnees were thereby compelled to bring out that the acquisition "amounted to a gift of the ski club" for the reason that the grantor, "an old timer" in the region, had so admired the fact that the Auburn Ski Club provided a public park where the public was welcome that he wanted the ski club to have it. The only compensation paid according to condemnees' testimony was to satisfy a small interest owned by Sherritt's sister. There was no conflicting evidence.

The state's real purpose in opening up the subject was obvious. It brought before the jury a "comparable" which no evidence showed to be a comparable. If there could be any doubt as to the real purpose it was removed during argument. Mr. Connor argued (for the state) : "I also asked him [condemnees' appraiser] about the Sherritt sale. . . . He never heard of that. The Auburn Ski Club didn't tell him about that sale. But we have evidence what the property sold for: $100 an acre for 224 acres up at the crest of the Sierra where you have snow first, last and best." When Mr. Miller used the same technique, objections were made and sustained. Sauce for the goose was not sauce for the gander. The state argues to this court that two wrongs do not make a right. Quite so—and if there has been a miscarriage of justice as a result of the misbehavior of counsel on both sides this reviewing court would have to reverse. (*People* v. *Sliscovich,* 193 Cal. 544, 557 [226 P. 611].)

Before discussing the question of the end-effect of the misconduct we will mention the state's final assignment of error: that Mr. Miller's improper questions during trial were carried over into his argument to the jury. This complaint might most quickly be answered by the statement that, assuming the argument attacked to have been improper, at no time during the argument was any objection made thereto. Counsel for the state waited until the argument had been completed, then made a motion for a mistrial. By its failure to object it might well be held to have waived what it now attacks. (*Horn* v. *Atchison T. & S. F. Ry. Co.,* 61 Cal.2d 602, 611 [39 Cal.Rptr. 721, 394 P.2d 561].) We prefer to rest our holding on the fact that Mr. Miller's argument was within bounds.

Principally objected to was the following: "Counsel says they have no right to consider we are taking 65.8 acres. What are they going to do with it? Why do they want it? What will they do with it? I don't know. They will do something with it. They will use the extra acreage. They are in the real estate

business just the same as anybody else. In fact, I think the biggest real estate operators in California.''

Mr. Miller's reference to the state as being in the real estate business was not an original idea brought before the jury initially by him. During the examination of condemnees' witness, Mr. Mikkelsen, and a colloquy regarding his qualifications to testify as a valuation witness, the following occurred: ''Q. Mr. Miller: Were you an officer of the Auburn Ski Club? A. Yes, I was. Mr. Elkind [for the state]: I didn't know the Auburn Ski Club was in the real estate business.''

One of the most hotly-contested issues in these proceedings was the question of the value of the land on the slope above the potential homesites. As shown above (see fn. 2), it was the state's earnest contention that it was a wasteland. Just as strenuously condemnees had urged its value for skiing and ski jumping. We do not consider that Mr. Miller's quoted statement during argument extended beyond the proper scope of partisan advocacy. In *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, we stated at page 393: ''Aggressive advocacy is not only proper but desirable. Our jurisprudence is built upon a firm belief in the adversary system. Moreover in a long trial . . . vigorously prosecuted and defended, frayed tempers leading to intemperate outbursts are a to-be-expected byproduct. Skilled advocates are not always endowed with 'high boiling points.' Juries, characteristically composed of average men and women, may be assumed able to withstand substantial blandishments without surrendering their ability to reason soberly and fairly. Recognizing these factors, reviewing courts are not, and should not be, overly eager to reverse for conduct which is merely moderately captious.''

We have reviewed the entire record in this case. (It covers seven volumes.) We are left with a conviction that the jury was not seriously affected by the overzealous advocacy of either party. As we intimated at the commencement of the opinion, we are impressed with the way an able trial judge kept control of the proceedings. Objections were promptly ruled on; the jury was at no time permitted to forget that statements of counsel were not evidence and were not to be considered by it. This is not a case like *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, 391, where the court completely lost control of the proceedings and acknowledged he had lost control, announcing, ''Lets all go home. What do you say we all go home.''

Our Supreme Court in *Horn* v. *Atchison T. & S. F. Ry. Co.,*

*supra,* 61 Cal.2d 602, states at page 610 (quoting from *Tingley* v. *Times-Mirror Co.,* 151 Cal. 1, 23 [89 P. 1097]) : " 'It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' "

Until very late in the trial, counsel for the state apparently did not believe the state was being prejudiced. As late as the twelfth day of the trial, after counsel for the state (somewhat unnecessarily it would appear from the record) had made the statement outside the jury's presence, "I sort of feel the Court is pressuring me a little bit," the court observed: "I don't think I am pressuring you at all. At the end of the day, you will have had three days. Now, the other side, up to this point, has had slightly over three days. I don't think there is any pressure here at all. . . . I want to get the record straight here about the People of the State of California being pressured. Does the People feel they are being unfairly treated here? MR. CONNOR: No, your Honor. THE COURT: Let's get the record straight. MR. CONNOR: I do not feel that way. . . ."

When a rebuke was called for it was given. At one point towards the end of the trial Mr. Miller, guilty of the same tactics as the attorneys for the state, i.e., of improper use during cross-examination of a sale not admissible as a "comparable," was sternly told: "Mr. Miller, once again I am going to caution you on those sort of tactics. It is not proper. I have done it in the absence of the jury, and I have done it now in the presence of the jury. This will be the last time. Let's proceed."

Regardless of the antagonism between the attorneys, which must have been as obvious to the jury as it is upon a reading of the transcript (and in which the "honors" seem to have been about even), we do not believe that it was likely to have had any effect upon the jury except to compel boredom.[3] At the end of the long and tedious trial the jury deliberated for nearly two days before reaching its verdict. The vote was nine to three, and the amount of the award, although more than

---

[3] On May 5, 1964, during the 13th day of the trial, the court had occasion to admonish the attorneys outside the jury's presence: "[G]entlemen, I wish you would have your co-counsel watch that jury for about thirty minutes. They are just to the point they are not absorbing any more. They are saturated. They are tired. They are not paying a great deal of attention. . . ."

twice that of the state's appraisers, was more than a hundred thousand dollars lower than the condemnees' lowest appraisal. There is no indication that the ability of the jury to accept the court's instructions and decide the case on the evidence was prejudicially affected—however much may have been its disenchantment with the lawyers.

Great weight must be given the fact that the judge who presided and was therefore in a better position than we are to weigh the possible effect which the misconduct of either side's attorneys might have had upon the jury denied the state's motion for a new trial. (*Walling* v. *Kimball,* 17 Cal.2d 364, 368-369 [110 P.2d 58].) We find no miscarriage of justice.

The judgment is affirmed.

Regan, J., and Bray, J.,* concurred.

A petition for a rehearing was denied May 24, 1966, and appellant's petition for a hearing by the Supreme Court was denied June 22, 1966.

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.