[Civ. No. 30753. First Dist., Div. One. Apr. 29, 1974.]

REDEVELOPMENT AGENCY OF THE CITY
AND COUNTY OF SAN FRANCISCO, Plaintiff and Respondent, v.
DEL-CAMP INVESTMENTS, INC., Defendant and Appellant.

## COUNSEL

Crimmins, Kent, Bradley & Burns, Kent, Bradley, Burns, Kaplan & Williams and Robert E. Burns for Defendant and Appellant.

Rogers, Vizzard & Tallett, Henry F. Davis and Thomas F. Vizzard for Plaintiff and Respondent.

Goldstein, Barceloux & Goldstein, Thorpe, Sullivan, Clinnin & Workman, Bressani, Hansen & Blos, Jackson, Turner & Mulcare, Fadem, Kanner, Berger & Stocker and Gideon Kanner as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**SIMS, Acting P. J.**—Defendant property owner has appealed from a judgment entered upon a jury award in a condemnation action.[1] It contends that the plaintiff Redevelopment Agency has failed to comply with federal law and that the taking is unlawful; that the court erred in permitting the condemnor to introduce evidence of value predicated upon the capitalization of business receipts, and in permitting its experts to testify as to the value of the property on the basis of only two of three recognized appraisal approaches; and that the court, in its rulings on the exclusion of evidence and in its instructions, prejudicially prevented the property owner from showing the depressing effect on property values of the redevelopment project itself.

On examination of these contentions, it is concluded that there was no prejudicial error in any of the particulars asserted. The judgment must be affirmed.

The subject property, located at the corner of Fourth and Mission Streets, in San Francisco, is known as the St. Regis Hotel. The property is a seven-story and basement building with ground floor stores on Fourth Street and Mission Street, a hotel lobby on Fourth Street, and 132 rooms with 36 private baths and 6 public baths per floor. The property is 80 feet by 80

---

[1] Plaintiff's purported appeal from the order of the court denying its motion for a new trial must be dismissed as an appeal from a nonappealable order, although the propriety of the order is subject to review insofar as it is embraced within the points made by plaintiff on appeal. (See Code Civ. Proc., § 904.1; *Morton* v. *Loveman* (1968) 267 Cal.App.2d 712, 719 [73 Cal.Rptr. 623].)

feet, a total of 6,400 square feet. The building occupies the entire lot area. The building is a Class 3 structure consisting of brick exterior, wood and steel frames, elevator, two fire escapes, sprinklers, wiring, and fire alarm systems and complies with local building and fire, safety and zoning laws.

The improvements were constructed circa 1912-1915. The defendant property owner had purchased the subject property in 1963 for the sum of $250,000, and thereafter added $50,000 in improvements. The hotel was, at the time of the trial, rented to a Mr. Powers under a month-to-month tenancy for $2,000 per month or $24,000 per year.

The property owner's appraiser Clark testified to the following values under the replacement cost approach: land value of $192,000 and building value of $290,750 for a total of $482,750. Under the income approach he arrived at a value of $470,000. This value was reached as follows: Mr. Clark testified that a fair and reasonable rent for the subject property would be based on an estimate of the rental value of the ground floor stores plus 25 percent of the gross receipts of the hotel operation, i.e., the room rent paid for hotel rooms. This figure came to a net annual income of $32,900. The net income was capitalized at a rate of 7 percent for a valuation of the property of $470,000. The market valuation reached by Clark on the basis of comparable sales was $490,000. Based on these three methods Clark gave the property a fair market value of $490,000. He considered the market approach the best indicator. Clark further testified that the cost replacement approach was the least reliable because of the difficulty of evaluating the depreciation factor and because the building could not be reproduced due to changes in building codes and fireproof standards.

The property owner's appraiser Farnow testified to the following valuations under the cost-replacement theory: land valued at $205,000 and building valued at $282,107 for a total of $487,107. Under the income approach he arrived at a value of $473,626. This figure is broken down as follows: Like Clark, Farnow used income from rental of hotel rooms as his basic data. He testified that a fair and reasonable rent for the subject property would be based on an estimate of the rental value of the ground floor stores plus 25 percent to 30 percent of the gross receipts of the hotel operation. He testified that hotel room rentals are the key data because: "Hotel operators of this type will pay between 25 and 30 percent of the gross income of the hotel as a rental for that hotel." Based on the above data Farnow testified to a yearly net income of $37,404, which he capitalized at approximately 7 percent for a total income valuation of $473,626. The market price theory valuation arrived at by Farnow was the amount

of $510,000. Based on these three valuations, Farnow placed on the subject property a fair market value of $485,000.

The agency's appraisers Hyman and Leslie did not utilize the replacement cost approach because of the age of the building and the impossibility of replacement. Each used gross receipts to the hotel operator as the basic data under the income approach. Hyman valued the subject property at $341,250 under the income approach. The figure breaks down as follows: A net yearly income of $34,000 based on 30 percent of gross hotel receipts and an estimated fair rental of the store area, capitalized at a rate of 10 percent equals $341,250. Under the market value theory, using comparable sales, he placed a value of $341,250 on the subject property. Based on the two methods Hyman testified to the sum of $341,250 as the fair market value.

Leslie valued the subject property at $323,000 under the income theory. The figure breaks down as follows: A net yearly income of $32,305 based on that portion of gross hotel receipts which would be paid to the owner of the property if the hotel were leased to an operator, plus an estimated fair rental of the store area. This figure is capitalized at a rate of 10 percent to reach the total of $323,000. Under the market theory the subject property was valued at $355,000. Based on these two theories Leslie placed a fair market value of $355,000 on the property.

The jury returned a verdict setting the fair market value at $360,000 and judgment was entered accordingly.

## I

It is contended that the taking of defendant's property was for a use not permitted by law. Reliance is upon Code of Civil Procedure section 1241, providing: "Before property can be taken, it must appear: 1. That the use to which it is to be applied is a use authorized by law; . . ."

The Yerba Buena Center Project is a community redevelopment plan designated and approved by the city's board of supervisors under the Community Revedelopment Law which is codified as Health and Safety Code sections 33000-33714, inclusive. It covers about 25 acres, the acquisition of which, by condemnation or otherwise, was authorized by the plan and permitted by sections 33342 and 33391. The public use contemplated by the plan was the redevelopment of the area. It follows that the public use for which defendant's property was sought was community redevelopment, a use concerning which defendant suggests no illegality.

Section 33500 provides: "No action attacking or otherwise questioning the validity of any redevelopment plan, or the adoption or approval of

such plan, or any of the findings or determinations of the agency or the legislative body in connection with such plan shall be brought prior to the adoption of the redevelopment plan nor at any time after the elapse of 60 days from and after the date of adoption of the ordinance adopting the plan."

Defendant's attack on the public use proposed by the redevelopment plan, made several years after adoption of the ordinance, is barred by Health and Safety Code section 33500. Upon "the elapse of 60 days from and after the date of adoption of the ordinance adopting the plan" without an adverse action having been brought, the legality of its proposed public use was conclusively determined; the effect was similar to that of a final adjudication of a court of record.

The instant contention is based on a 1969 brochure of the Redevelopment Agency which, under the title "Development Opportunities," suggests that a hotel (located in another area of the project) which will have over 800 rooms and other conveniences "is a major development opportunity in itself." Such a "hotel use" of a portion of the project's area, defendant insists, is contrary to law and therefore contravenes Code of Civil Procedure section 1241.

The public use for which defendant's property was to be taken was community redevelopment, not the construction of a hotel. If such a hotel is planned somewhere in the project, and if its construction is contrary to law, adequate remedies are obviously available. Further, we observe that defendant's claim of "hotel use" illegality is based upon the absence of express consent thereto by the board of supervisors and the appropriate federal agency. The Redevelopment Agency's brochures suggesting a hotel complex opportunity is not inconsistent with a purpose to secure such permission upon receipt of a related suitable development proposal.

## II

Section 819 of the Evidence Code provides: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the capitalized value of the reasonable net rental value attributable to the land and existing improvements thereon (as distinguished from the capitalized value of the income or profits attributable to the business conducted thereon)."

The appraisers, both those for the property owner and those for the agency, alluded to the gross receipts from the rent of hotel rooms. That

figure formed the basis of what the operator would be willing to pay the owner as rent, and the latter figure was capitalized along with the rents from the stores. The use of the gross income figures did not violate the provisions of the foregoing section. All of the appraisers arrived at net rental income figures to the owner which were in a comparable range. The testimony that a hotel operator would be willing to pay a certain percentage of gross room rental receipts as rent to the owner was not improper. (See Evid. Code, § 817.) Nor does it appear that the use of a comparison of what an owner operator would pay for a property producing a total gross rent—"gross rent multiplier"—was erroneous. The appraisers were examined and cross-examined with reference to that approach.

The property owner's complaint that the agency's appraiser's appraisals should be disregarded because they made no effort to appraise the property by use of the reproduction cost method (see Evid. Code, § 820) is not sustained by any authority. (Cf. *State of Cal. ex rel. State Pub. Wks. Bd.* v. *Stevenson* (1970) 5 Cal.App.3d 60, 63 [84 Cal.Rptr. 742]; and *People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 427-428 [196 P.2d 570, 6 A.L.R.2d 1179].) Even the property owner's appraisers conceded that because of the age of the structure and changing building requirements the reproduction cost approach to fair market value was not satisfactory.

## III

The owner contends that he was prejudicially prevented from proving that the Yerba Buena Project depressed the value of the subject property. *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr 1, 500 P.2d 1345], which was decided after the 1970 trial of this case, does not involve the valuation of property actually condemned. The court merely held that a property owner has a right to recover in inverse condemnation when condemnation is authorized and then abandoned resulting in a loss of rental value or other economic benefit from the property during the period while the condemnation was an actual threat. The court ruled, "Accordingly we hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (8 Cal.3d at p. 52, fn. omitted.)[2]

---

[2]For purposes of proving such damages, had they been pleaded in this case, the applicable date to determine a diminution in value would have been the adoption of the ordinance for condemnation in April 1966, and not the mere adoption of the general plans in 1961 and 1964. (See *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 127-128 [109 Cal.Rptr. 799, 514 P.2d 111].)

Here there was no pleading of such special damage by reason of the delay in effecting condemnation. Nor was there anything to show that the rental income figures used by the appraisers in determining the 1970 values were depressed. The appraisers agreed on what was the principal comparable sale. The dispute evolved on what were the proper factors to be applied to the 1967 sale of the Atlanta Hotel for a price of $557,000 on the basis of gross income to the lessor-purchaser of $50,645, or a net return of $38,977 or 6.6 percent. The significance of that sale varied with the appraiser's opinion of what a knowledgeable purchaser would pay as of the valuation date in these proceedings, June 29, 1970. Respondent's appraisers consistently used a higher rate of return, which, from all that appears, may have been due to higher interest rate in 1970 than in 1967. Furthermore, the respondent's appraisers used a gross rent multiplier, which, although attacked by appellant as improper, is not shown to be incompetent as a matter of law. The reason for the experts' opinion was a matter for consideration by the triers of fact. The salient point is that neither appellant's nor respondent's appraisers testified or were requested to testify that the sale in question was one in which the value was either depressed or enhanced by the pending redevelopment proceedings.

With respect to the income approach, there is no indication that any of the appraisers were using depressed or enhanced values. Here again the issue revolved about what percentage of the gross rentals of the hotel rooms a prospective purchaser would expect to receive, and what return he would expect in capitalizing the rentals received in order to compute the purchase price. The actual rentals on the hotel portion of the depressed property were $24,000. Appellant's appraisers estimated figures of $32,900, and $37,404, respectively, for the net rents from the hotel and stores. Respondent's appraisers used figures of $34,000 and $32,305. As is ably pointed out in appellant's brief, the difference in the final appraisal on the rental income basis was caused, not by reference to values depressed by the threat of condemnation, but because of a difference in the rate of capitalization—7 percent by appellant's appraisers and 10 percent by respondent's. The jury apparently considered the latter figure more realistic.

There was no violation of the rule expressed in *Buena Park School Dist.* v. *Metrim Corp.* (1959) 176 Cal.App.2d 255 [1 Cal.Rptr. 250], which states, "The just compensation which the California Constitution directs must be paid to the owner of land taken for public purposes is defined to be the fair market value. It is 'the highest price estimated in terms of money which the land would bring in the open market, with reasonable time allowed in which to find a purchaser. . . .' (*Sacramento Railroad Co.* v. *Heilbron,* 156 Cal. 408 . . .) This classic definition of market value con-

templates, of course, the price which the property would have brought at the time of valuation had it then been placed upon the market and had it then been available for sale. It is obvious that in determining that value the trier of fact must disregard the fact that at the time because of the filing of condemnation proceedings the property was not actually salable. It is a matter of common knowledge that a purchaser would not buy property in the process of being condemned except at a figure much below its actual value. It follows, therefore, that in arriving at the fair market value it is necessary that the jury should disregard not only the fact of the filing of the case but should also disregard the effect of steps taken by the condemning authority toward that acquisition. To hold otherwise would permit a public body to depress the market value of the property for the purpose of acquiring it at less than market value." (176 Cal.App.2d at pp. 258-259. See also *People* ex rel. *Dept. of Public Works* v. *Lillard* (1963) 219 Cal. App.2d 368, 377 [33 Cal.Rptr. 189].)

The record reflects that owner's first witness, the appraiser Clark, defined the income approach to the jury, and when questioned as to how he arrived at the income of the building answered as follows: "There were several steps that I took: One was an examination, of course, of the existing leases and rents that are on the property. The second was to compare it with other similar type properties, rents and leases that were existing. And the third method was to interview similar type hotel operators and property owners who operate a similar type of commercially-improved properties as the subject." After giving the net figure of $32,900, which he subsequently capitalized at 7 percent to $470,000, and a gross rental figure, he reiterated the source of his rental estimates. The owner opened up the subject of the actual rents received by asking the witness, "And what did you find with respect to those actual rents as against economic rents?" The witness then referred to the actual rents for 1968 and 1969. The question was repeated and the witness indicated that the economic rental that he estimated for the stores was higher than the actual rental. He was then asked, "And would you please state the reasons that you attributed a higher economic rental than an actual rental? He replied, "Based on my interviewing the tenants of the subject property, and based on the study of the area that is outside the present project area, it was my opinion that the rents that have been charged at the subject property are not what I would call the present fair rental value of the ground floor space." He then explained that he had studied two or more hotels outside the area in coming to that conclusion. The next question reads, "Is there any reason, from your investigation and your opinion, why higher rents were not received, that is, rents commensurate with your opinion as to economic rentals from the store properties received by this property?" The condemner's objection to

this question was sustained and the matter was continued for discussion at the next recess.

The following morning the owner made the offer of proof set forth in the margin.[3] The condemner pointed out that the owner not the condemner had brought out the actual rental figures, and that its appraisers would testify to rental figures for the purpose of appraisement which were commensurate with those used by Clark. It pointed out, ". . . we are not penalizing the property for any vacancies or any lower rents. We have in fact adjusted the rents." The court sustained the condemner's objection. The proffered evidence was not offered to show damages as in *Klopping*. Some explanation of the reason for not using the actual rentals well might have been permitted. (See *People* ex rel. *Dept. of Public Works* v. *Lillard, supra,* 219 Cal.App.2d 368, 377.) Nevertheless, in the absence of any showing that any appraiser used actual rentals, as distinguished from estimated rentals as the sole basis in computing the capitalized value of the property on the income theory, no prejudice resulted to the owner.

The owner complains he was restricted in cross-examining the condemner's appraiser, Hyman, who had testified to a value of $341,250 predicated on a net income of $34,100, $1,200 higher than the owner's witness Clark. Hyman testified, when asked about comparable sales used in the marked data approach, as set forth in the margin.[4] Following that colloquy, the owner asked: "And that has had a restrictive influence on rents, principally

---

[3]"We offer to prove that tenants are not and were not available for leases because they knew they would be ousted by the Redevelopment Agency, and the tenants would not invest in improvements or in moving costs in moving into the property in the building or establishing a good-will at the location; and as a result, the rents which defendant could obtain were substantially lower than rents which otherwise could have been received, at least from April 1966 upward, and also, as we shall show, prior to that time, by reason of the action of the Redevelopment Agency. Rents would have been higher in the stores, and we offer to prove that, and in the hotel, but threat of condemnation prevented them from getting these higher rents. [¶] We offer to show that this property was also under threat of condemnation from at least 1961, December 1961, to the present time, and this has depressed rents of this property and property in the area, and prevented its full and economic use." [There follows reference to official actions taken by the city with respect to the redevelopment in 1961, 1964, 1965 and 1966.]

"We also offer in support of this offer of proof that plaintiff will admit and probably offer evidence that the gross receipts of the subject property have not increased substantially over the last six or seven years, but defendant is prevented from answering this contention and showing that defendant was prevented from increasing the rents by reason of the matters which I have heretofore offered to prove. [¶] We also respectfully submit that unless defendant is allowed to show the grounds and the economic reason for the lack of increase in gross income or the small increase in gross income of the subject property, its right to a proper award by the jury will be prejudicially affected."

[4]"Q. Have there been any increases in values in the Yerba Buena Project area since 1963? A. You mean within the project itself, Mr. Burns? Q. Yes, as shown

ground floor rents in properties within the project area; isn't that right?" The court sustained the condemner's objection. The following then ensued: "[Q] Haven't you testified that in the subject property, basically you couldn't raise the ground floor rents? A. Yes. I don't think you could raise the ground floor rents very much because I think the tenants on the ground floor are paying everything that the traffic will bear. Q. Isn't it a fact that they are not able to get long-term leases? A. That is true. Q. And doesn't that constrict the ability of the landlord to get higher rents? A. Not for the type of tenants that we have on the ground floor here, Mr. Burns. We are talking in terms of a barbershop and a little furniture store and a little cafe. You don't push those kind of rents around very much. They stay reasonably constant. My estimate of the gross income from the ground floor was $1,000 more than actual. I think ground floor rents of $17,000 a year reflect the value of the ground floor if the owner of the property were completely free to do with it as he saw fit."

From the foregoing it is clear that Hyman was setting his figure not on the actual rents received but on what he thought the property would produce "if the owner of the property were completely free to do with it as he saw fit." Again the court might properly have permitted an answer to the question, but no prejudice has been demonstrated.

Finally the owner objects to an instruction based on the language of BAJI No. 11.77 as it existed[5] prior to its revision in 1973 following the decision in *Klopping*.[6] Since there is no claim of enhancement in value (see

by sales or any other factor. A. Well, there have been no sales within the project since early 1966 with the exception of one trade, because the Agency started filing their actions I believe in early—well, no, the Board of Supervisors declared this an urban renewal project in May or June of 1966, and at that point all action within the project stopped. We have used sales of properties outside of the project in order to reflect the value outside the project into the project. For example, the Ford I think is the most recent sale in the area. So whatever the sales show is what we are going to—Q. All sales in the project area, as you say, have stopped since April 1966, when the Supervisors approved the project as submitted by the Redevelopment Agency; is that right? A. That's correct."

[5]This instruction read: "You are instructed further that the property being taken may not be valued with reference to any enhancement or depreciation in value, if any, to said property arising solely and directly from the public improvement proposed by the plaintiff. Increase or decrease in value, if any, caused by the construction or knowledge of the construction of the public improvement is excluded in the determination of fair market value."

[6]On the basis of *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 495 [93 Cal.Rptr. 833, 483 P.2d 1], No. 11.77 was revised to read as follows: "In determining the fair market value of the property being taken you may not include any increase in the market value thereof because of the proposed improvement. [¶] [However, you may include any increase in the market value of said property attributable to the proposed improvement up to the date when it became probable

No. 11.77 (1973 rev.)), or pleading or proof of damages from excessive delay in commencement of the action (see No. 11.79 (1973 rev.)), the instruction given properly expressed the law as found in the respective first paragraphs of the new instructions.

The appeal from the order denying defendant's motion for a new trial is dismissed. The judgment is affirmed.

Bray, J.,* concurred.

**ELKINGTON, J.**—I would reverse the judgment.

At the trial defendant endeavored to prove that the long standing public knowledge of the property's impending condemnation had the effect of greatly depressing its value. It sought a ruling, and appropriate jury instructions, that the award should be an amount equal to what the property's fair market value would have been, but for that depressive effect. The trial court, faced with the then inconsistent authority on the subject, ruled that the evidence would not be allowed and the instructions would not be given.

Following the trial, and while defendant's appeal was pending, the state's high court decided the case of *Klopping* v. *City of Whittier,* 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. Resolving the decisional conflict to which we have adverted, the court (p. 50) agreed "in principle" with the following language of *Buena Park School Dist.* v. *Metrim Corp.,* 176 Cal.App.2d 255, 258-259 [1 Cal.Rptr. 250]: "This ·classic definition of market value contemplates, of course, the price which the property would have brought at the time of valuation had it then been placed upon the market and had it then been available for sale. It is obvious that in determining that value the trier of fact must disregard the fact that at that time because of the filing of condemnation proceedings the property was not

---

that it would be included as part of the public improvement, which date you will accept as ———.]"

On the basis of *Klopping* a new instruction No. 11.79 was added reading as follows: "In determining the fair market value of the property being taken you will disregard any decrease in market value caused by the likelihood that it would be acquired for the public improvement, provided that there has been no unreasonable delay in commencing this action after the announcement of intent to condemn the subject property. [¶] However, if you find that the plaintiff excessively delayed the commencement of this action following an announcement of intent to condemn the subject property, you shall include in your verdict [the amount of defendant's loss of rental income from the subject property, if any, due to such delay] [the additional amount, if any, the subject property would have been worth on the date of valuation but for such delay]."

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

actually salable. It is a matter of common knowledge that a purchaser would not buy property in the process of being condemned except at a figure much below its actual value. It follows, therefore, that in arriving at the fair market value it is necessary that the jury should disregard not only the fact of the filing of the case but should also disregard the effect of steps taken by the condemning authority toward that acquisition. To hold otherwise would permit a public body to depress the market value of the property for the purpose of acquiring it at less than market value."

The *Klopping* court announced (8 Cal.3d at p. 52): "[W]e hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value."

It will be seen that the trial court's rulings were contrary to the holding of *Klopping*.

The majority distinguish the case at bench, a *direct* condemnation proceeding, from *Klopping* which was in *inverse* condemnation. The distinction seems unreasonable, and contrary to the holding of *Klopping* quoted above.

A petition for a rehearing was denied May 24, 1974. Elkington, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied July 10, 1974.