T.C. Memo. 1998-448


UNITED STATES TAX COURT


MICHAEL H. JOHNSON AND PATRICIA E. JOHNSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23702-96.                Filed December 23, 1998.


<u>Terry B. Bates</u>, <u>Brian J. Seery</u>, and <u>Robert A. Olson</u>, for
petitioners.

<u>Steven M. Roth</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of
$918,931, an addition to tax pursuant to section 6651(a)(1) of

$181,033, and a penalty pursuant to section 6663(a) of $689,198 with respect to petitioners' 1992 Federal income tax.[1]

The issues for decision are: (1) Whether petitioners are entitled to defer recognition of gain on the disposition of property located at 45640 North 23d Street West in Lancaster, California (the 23d Street property), pursuant to section 1033; (2) whether petitioners are liable for the fraud penalty pursuant to section 6663(a), or, in the alternative, whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a) for 1992; and (3) whether petitioners are liable for the addition to tax for failure to timely file their return for 1992.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Quartz Hills, California, at the time they filed their petition.

The 23d Street Property

In 1982, the Lancaster Redevelopment Agency (the LRA) prepared a Redevelopment Plan for the Lancaster Fox Field Redevelopment Project pursuant to California Community

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Redevelopment Law, California Health and Safety Code sections 33000-33855 (West 1973 & Supp. 1998). On November 1, 1982, the LRA passed, approved, and adopted Resolution No. 12-82 transmitting its report and Redevelopment Plan to the City of Lancaster, California (Lancaster). On December 20, 1982, at a meeting of the City Council of Lancaster (the LCC), the LCC, by Ordinance No. 289, approved and adopted the Redevelopment Plan for the Fox Field Redevelopment Project.

The rules and regulations of the Fox Field Redevelopment Project provided as follows:

> The Project Area is large and contains many parcels of real property. As a result there is a need to simplify the availability of participation opportunities. Therefore, as an alternative to requiring a participation agreement for each property not to be purchased or subject to Agency [the LRA] acquisition by eminent domain, the Agency is authorized to make determinations of those properties which conform to the Redevelopment Plan. If such a determination is made by the Agency then the property will not be subject to eminent domain by the Agency as long as the property continues to conform to the Redevelopment Plan. The Agency shall in good faith review the property contained in the Project Area and issue Certificates of Conformance to qualifying properties as soon as possible consistent with the restoration and redevelopment permitted by the Plan and specific designs for development adopted by the Agency pursuant to the Plan.

The 23d Street property is located in the Fox Field Redevelopment Project. In February 1983, the LRA approved an agreement between the LRA and petitioner Michael H. Johnson (Mr. Johnson) to assist in the development of a Ford motor vehicle

dealership in the Fox Field Redevelopment Project at the 23d Street property. Petitioners were then the owners of the 23d Street property.

## The Car Dealerships and City Tax Revenue

During the relevant time period, Mr. Johnson operated Ford and Lincoln-Mercury motor vehicle dealerships on the 23d Street property.

Cities in California receive 1 percent of the gross sales tax from auto sales in that city.

## The LCC, the LRA, and the Attorneys Involved

The LCC had five members. The LCC comprised the five voting members (directors) of the LRA.

During the relevant time period, George Root (Mr. Root), Arnie Rodio (Mr. Rodio), Henry Hearns, William Pursley (Mayor Pursley), and George Theophanis (Mr. Theophanis)[2] were members of the LCC and directors of the LRA.

Steven Dukett (Mr. Dukett) was the Redevelopment Director of the LRA, and Mark Asturias (Mr. Asturias) was the Senior Development Projects Coordinator of the LRA.

David McEwen (Mr. McEwen) was the city attorney of Lancaster and counsel for the LRA. In April 1990, Mr. Johnson retained David Wright (Mr. Wright) in connection with the Palmdale Auto Mall transaction.

---

[2] Mr. Theophanis died before the trial in this case.

The Palmdale Auto Mall v. the Lancaster Auto Mall

Lancaster and the City of Palmdale, California (Palmdale) are located in the Antelope Valley of California, which is 75 miles north of Los Angeles. The cities are only 5 miles apart.

During the period in question, Lancaster was engaged in an auto mall development competition with Palmdale. Prior to October 1990, Lancaster had invested approximately $10 million into the development of an auto mall. Previously, Lancaster lost a competition for a regional shopping center to Palmdale.

Lancaster felt that it needed a domestic auto dealer as an anchor in its auto mall, and it wanted Mr. Johnson's motor vehicle dealerships to relocate to the Lancaster Auto Mall.

On February 14, 1989, Mr. Johnson signed a Disposition and Development Agreement (DDA) concerning a planned relocation to the Palmdale Auto Mall located in Palmdale.[3]

On July 19, 1989, the LRA made a proposal to Mr. Johnson concerning relocating his motor vehicle dealerships to the Lancaster Auto Mall. In a letter dated July 26, 1989, Mr. Johnson declined this offer and indicated he was going to move his motor vehicle dealerships to the Palmdale Auto Mall.

---

[3] It is unclear from the record whether Mr. Johnson would be relocating his Ford dealership, his Lincoln-Mercury dealership, or both dealerships; however, it is clear that Mr. Johnson thought he would be moving both motor vehicle dealerships.

On August 18, 1989, Palmdale signed the DDA regarding Mr. Johnson's move to the Palmdale Auto Mall.

After learning of Mr. Johnson's agreement with Palmdale but before Mr. Johnson terminated his agreement with Palmdale, Mr. McEwen advised the LCC and the LRA staff to refrain from any negotiations with Mr. Johnson concerning the 23d Street property while Mr. Johnson was under agreement with Palmdale.

While under contract with Palmdale, Mr. Johnson tried to negotiate with Lancaster to move his motor vehicle dealerships to the Lancaster Auto Mall. Between April 1990 and September 1990, he sent several letters to Lancaster city officials in an effort to communicate the terms of his offers. The LCC, however, was unwilling to negotiate with Mr. Johnson during this time. A letter dated June 22, 1990, specifically mentioned Lancaster's unwillingness to negotiate with Mr. Johnson. During this period, Lancaster rejected Mr. Johnson's proposals.

In early 1990, Mr. Johnson's negotiations concerning relocating his motor vehicle dealerships to the Palmdale Auto Mall began to deteriorate. This was due in part to the fact that William Royster (Mr. Royster), the developer of the Palmdale Auto Mall who was negotiating with Mr. Johnson on behalf of Palmdale, made representations that were not the position of Palmdale and to which Palmdale was unwilling to commit.

By letter dated October 15, 1990, Mr. Johnson informed Mr. Royster that he (i.e., Mr. Johnson) was withdrawing from the agreement to relocate his motor vehicle business to the Palmdale Auto Mall. This letter was hand delivered to Mr. Royster.

After terminating discussions with Palmdale in mid-October 1990, Mr. Johnson intended to remain at the 23d Street property or to sell the motor vehicle dealerships to a third party.

In October 1990, shortly after Mr. Johnson terminated discussions with Palmdale, Lancaster city officials learned that Mr. Johnson had withdrawn from his agreement with Palmdale and that the withdrawal upset Palmdale city officials.

After learning that Mr. Johnson's negotiations with Palmdale had terminated, Mr. McEwen advised the LCC and the LRA that they possessed the power and the authority to condemn, and to threaten condemnation of, the 23d Street property.

The LCC and the LRA approved the use of threats of condemnation against petitioners. The LRA directed its staff to notify Mr. Johnson that the LRA would condemn the 23d Street property.

Lancaster Officials Tell Mr. Johnson That Lancaster Is Going To Condemn the 23d Street Property

On or about October 16, 1990, while visiting Mr. Johnson at the 23d Street property, Mr. Theophanis told Mr. Johnson that Lancaster would condemn the 23d Street property unless

petitioners agreed to sell the property to Lancaster and relocate the motor vehicle dealerships to the Lancaster Auto Mall.

On October 29, 1990, in a meeting in Mayor Pursley's office at Lancaster City Hall, Mr. Theophanis again advised Mr. Johnson that Lancaster would condemn the 23d Street property. Mayor Pursley witnessed Mr. Theophanis' tell Mr. Johnson that Lancaster would condemn the 23d Street property, and Mayor Pursley also informed Mr. Johnson that Lancaster would condemn the 23d Street property.

At the October 29, 1990, meeting, Lancaster wanted to make it crystal clear to Mr. Johnson that the LCC and the LRA were going to do everything in their power to put Mr. Johnson in the Lancaster Auto Mall. In particular, Mr. Theophanis made it very clear to Mr. Johnson that one way or the other, Mr. Johnson's motor vehicle dealerships were going to end up in the Lancaster Auto Mall. If condemnation was required, that is what Lancaster would do.

Mr. Dukett told Mr. Johnson that Lancaster would condemn the 23d Street property. Mr. Dukett advised Mr. Johnson that the LCC supported telling Mr. Johnson that Lancaster would condemn the 23d Street property and would proceed with condemnation if Mr. Johnson refused to negotiate. Mr. Asturias witnessed Mr. Dukett advise Mr. Johnson that Lancaster would condemn the 23d Street

property.  Mr. Asturias also frequently informed Mr. Johnson that Lancaster would condemn the 23d Street property.

A letter to Mr. Johnson regarding condemnation of the 23d Street property was drafted, and Mr. McEwen approved it as to form and content (with one change).  This letter was edited, dated August 4, 1991, and signed by Mr. Dukett.  The letter stated the following:

> This letter is to confirm conversations which you are having with the staff of the Lancaster Redevelopment Agency concerning the acquisition of your property. The property, located at 45640 North 23d Street West, commonly known as the Johnson Ford/Lincoln Mercury Dealership location, is currently proposed to be acquired by the Agency through negotiations.  As you are aware, the Agency is authorized to acquire property by the use of eminent domain.  If these negotiations are unsuccessful, staff will recommend to the Agency Board that they proceed with proceedings for the acquisition of your property through the exercise of the power of eminent domain.

On or about August 4, 1991, Mr. Dukett delivered this letter to Mr. Johnson.

## Mr. Johnson Seeks Advice After Being Told That Lancaster Would Condemn the 23d Street Property

In October 1990, after Mr. Theophanis informed Mr. Johnson that Lancaster would condemn the 23d Street property, Mr. Johnson sought advice from Mr. Wright regarding Lancaster's threats.  Mr. Johnson specifically asked Mr. Wright, "Can they do that?"  Mr. Wright advised Mr. Johnson that (1) Lancaster had the authority to condemn the 23d Street property, (2) whether or not Lancaster and the LRA had the ability to condemn was not an issue, and (3)

the only issue would be the fair market value of the property. Mr. Wright made it clear to Mr. Johnson that he would not be able to win a condemnation fight.

## The Negotiations That Followed Mr. Johnson Being Told That Lancaster Would Condemn the 23d Street Property

The negotiations between Lancaster and Mr. Johnson while the LRA and the LCC were informing Mr. Johnson that Lancaster would condemn the 23d Street property were hostile, strained, tense, and difficult with Lancaster repeatedly telling Mr. Johnson that Lancaster would condemn the 23d Street property.

On September 16, 1991, Mr. Johnson entered into a DDA with the LRA. The DDA expressly states that the LRA desired to acquire the 23d Street property "for purposes of redevelopment by an action in eminent domain or by deed in lieu thereof," and the purpose of the DDA was to effectuate the Redevelopment Plan by providing for the LRA's acquisition of the 23d Street property "for redevelopment by agreement in lieu of an action in eminent domain for such purposes."

Escrow documents executed in connection with the DDA expressly state that the transaction was "in lieu of an action in eminent domain".

## The New Property

In 1992, Mr. Johnson acquired property in the Lancaster Auto Mall that was "property similar or related in service or use to"

the 23d Street property.  Mr. Johnson relocated to the Lancaster Auto Mall immediately upon vacating the 23d Street property.

Petitioners' 1992 Tax Returns

Petitioners filed a Form 4868, 1992 Application for Automatic Extension of Time to File U.S. Individual Income Tax Return.  On April 15, 1993, respondent received the Form 4868.  On August 13, 1993, petitioners filed their 1992 tax return.

OPINION

I.  Section 1033

As a general rule, gain realized from the sale or other disposition of property must be recognized.  Sec. 1001(c).  Section 1033 provides an exception to this rule.  If property, as a result of condemnation or threat or imminence thereof, is compulsorily or involuntarily converted into money, no gain shall be recognized if (1) the taxpayer elects nonrecognition treatment, (2) the taxpayer purchases property similar or related in service or use to the property converted within the statutory time limit, and (3) the cost of the replacement property equals or exceeds the amount realized on the conversion.  Sec. 1033(a).

Section 1033 is a relief provision enacted to allow a taxpayer to replace property involuntarily converted without recognizing any gain resulting from that conversion.  John Richard Corp. v. Commissioner, 46 T.C. 41, 44 (1966).  As a relief provision, this section is construed liberally to achieve

its purpose.  Filippini v. United States, 318 F.2d 841, 844 (9th Cir. 1963); John Richard Corp. v. Commissioner, supra at 44.

Respondent concedes that (1) petitioners have made the election, (2) petitioners purchased property similar or related in service or use to the property converted within the statutory time limit, and (3) the cost of the replacement property equaled or exceeded the amount realized on the conversion.  The only issue is whether Lancaster made a "threat of condemnation" regarding the 23d Street property.

A "threat of condemnation" exists if (1) the body threatening condemnation possesses the power of eminent domain, (2) the property owner is told by an official of the threatening body that condemnation will be sought unless the owner negotiates a sale or exchange of the property, and (3) the information conveyed to the owner gives the owner reasonable grounds to believe that the threat was authorized and likely to be carried out unless a sale or exchange is arranged.  Tecumseh Corrugated Box Co. v. Commissioner, 94 T.C. 360, 376-377 (1990), affd. 932 F.2d 526 (6th Cir. 1991); Maixner v. Commissioner, 33 T.C. 191, 195 (1959); Dominguez Estate Co. v. Commissioner, T.C. Memo. 1963-112; Carson Estate Co. v. Commissioner, T.C. Memo. 1963-90.

The existence of a threat of condemnation is judged from the seller's perspective taking into account all facts known at the time of sale.  Tecumseh Corrugated Box Co. v. Commissioner,

supra at 377.  Generally, we are willing to find that a threat of
condemnation has taken place if the taxpayer might reasonably
believe from representations of Government agents and from
surrounding circumstances that condemnation was likely to take
place if the taxpayer did not sell the property.  Id. at 376.  We
have been unwilling to find a threat, however, where it should
have appeared to the taxpayer that the chance of condemnation was
remote.  Rainier Cos. v. Commissioner, 61 T.C. 68, 76 (1973),
revd. and remanded in part on another issue without unpublished
order 538 F.2d 338 (9th Cir. 1975); Warner v. Commissioner, 56
T.C. 1126, 1137 (1971), affd. without published opinion 478 F.2d
1406 (7th Cir. 1973).  Whether property is converted under a
threat of condemnation is a question of fact, and petitioners
bear the burden of proof.  Rule 142(a).

1.  Eminent Domain

The body threatening condemnation must possess the power of
eminent domain.  Under section 1033, as long as an agency could
readily obtain authority to condemn in the event that the
taxpayer refused to cooperate, actual authority to condemn is not
required at the time the threat was made.  See Balistrieri v.
Commissioner, T.C. Memo. 1979-115.

Cities in California have the power of eminent domain.  Cal.
Govt. Code sec. 37350.5 (West 1988); City of Needles v. Griswold,
8 Cal. Rptr. 2d 753 (Ct. App. 1992).  Lancaster's ability to

"take" is broad.  See <u>Berman v. Parker</u>, 348 U.S. 26 (1954);

<u>Redevelopment Agency v. Del-Camp Invs., Inc.</u>, 113 Cal. Rptr. 762

(Cal. Ct. App. 1974).  A city in California may also form a

redevelopment agency which, subject to its specific mandate and

approved redevelopment plan for a particular area, can acquire

land within the plan area through condemnation or otherwise.

Cal. Health & Safety Code secs. 33000-33714; see also

<u>Redevelopment Agency v. Del-Camp Invs., Inc.</u>, <u>supra</u>.

Section 403 of the Fox Field Redevelopment Project plan

provides, in pertinent part, that "The Agency [the LRA] may

purchase, lease, obtain option upon or otherwise acquire real

property located in the Project Area by gift, devise, exchange,

purchase, or any other means authorized by law including the use

of eminent domain for purposes of redevelopment."

Petitioners argue that both Lancaster and the LRA had the

power to condemn, via eminent domain, the 23d Street property.

Respondent concedes that Lancaster has eminent domain authority

pursuant to California Government Code section 37350.5 but argues

that the LRA could not condemn the 23d Street property using the

power of eminent domain.

We are unpersuaded by respondent's argument.  As respondent

concedes, California law provides Lancaster with the power of

eminent domain.  Therefore, we need not consider whether the LRA

possessed this power.[4]  We conclude that the body threatening
condemnation possessed the power of eminent domain.

    2.   <u>The Threats</u>

    The taxpayer must have received a threat to acquire property
through condemnation.  The taxpayer may receive threats orally or
in writing.

    Respondent points out that the gravamen of the case at bar
is whether Lancaster threatened Mr. Johnson with condemnation of
the 23d Street property.  Respondent argues that the testimony of
the multitude of witnesses who stated that numerous Lancaster
city officials threatened Mr. Johnson with condemnation of the
23d Street property is not believable.

    After considering the record as a whole, and determining the
weight to be accorded to the testimony of the various witnesses,
we conclude, as we have found as facts, that several Lancaster
city officials made very clear threats of condemnation to Mr.
Johnson.  Mayor Pursley, Mr. Rodio, Mr. Root, Mr. McEwen, Mr.
Dukett, and Mr. Asturias all credibly testified that, after Mr.
Johnson terminated his agreement with Palmdale, the LCC and the
LRA repeatedly threatened Mr. Johnson with condemnation of the
23d Street property.  Mr. Asturias testified that threats of

---

    [4]  We note, however, that based on the facts of this case
and the law of California the LRA did possess the power to
condemn the 23d Street property or it could have readily obtained
such power.

condemnation were used "practically every time we talked to him." Several witnesses who were members of the LRA and the LCC during the period in question also credibly testified that the threats were authorized and that there was considerable animosity between (1) the LRA and Mr. Johnson and (2) the LCC and Mr. Johnson.

Respondent argues that respondent's inability to find any witness to refute the testimony concerning oral threats of condemnation of the 23d Street property by Lancaster city officials does not mean the threats occurred or if they occurred that they were genuine. This argument is unsupported by the facts of this case.

Respondent also argues that the chance of condemnation by Lancaster was remote. We have been unwilling to find a threat where it should have appeared to the taxpayer that the chance of condemnation was remote. Rainier Cos. v. Commissioner, supra at 76; Warner v. Commissioner, supra at 1137.

Respondent argues that the LCC and the LRA failed to comply with California law and did not take the steps necessary to condemn the 23d Street property.

Several witnesses who were members of the LRA and the LCC during the period in question credibly testified that both the LCC and the LRA were prepared to proceed to the next step in the condemnation protocol if a negotiated sale was not consummated. We do not believe that Lancaster's decision to forgo beginning

the next steps in the condemnation protocol made the chance of condemnation less remote.

The facts are that representatives of the LRA and members of the LCC threatened Mr. Johnson with condemnation of the 23d Street property, and they meant it.  We conclude that members of the LCC and the LRA genuinely threatened Mr. Johnson with condemnation of the 23d Street property.

3.   Reasonable Belief of the Threat

The taxpayer must believe that the threat is likely to be carried out if a voluntary sale is not arranged.

Respondent believes the dealings between Lancaster and Mr. Johnson were a structured transaction.  This belief is based, in part, on a letter Mr. Johnson wrote to Steven West, the former city manager of Lancaster, dated June 22, 1990.  In this letter, Mr. Johnson explained the factors motivating him to negotiate a deal with Lancaster.  Among the many factors listed in the letter were (1) Lancaster's ability to perform a friendly condemnation, and (2) section 1031 treatment for the exchange of the 23d Street property.  In the letter, Mr. Johnson stated that this "virtually eliminates" his potential tax liability.

From this letter and respondent's initial contacts with petitioners and Lancaster city officials, respondent was convinced that something sinister was afoot.  Respondent casts Lancaster as powerless, compliant to Mr. Johnson's demands, and

fearful of not acceding to his will; respondent portrays Mr. Johnson as forcing Lancaster into feigning threats of condemnation so petitioners could be accorded section 1033 treatment. Respondent contends that when Mr. Johnson rejected the Palmdale deal, "he had Lancaster exactly where he wanted."

It is from this viewpoint that respondent argues that Mr. Johnson could not believe the threats of condemnation were likely to be carried out because Mr. Johnson forced Lancaster to pretend to threaten him. Furthermore, respondent contends that if Lancaster repeatedly threatened Mr. Johnson with condemnation and then took no action, a reasonable person would not believe the threats.

We disagree. Lancaster and Mr. Johnson were involved in bitter, antagonistic, contentious, and hostile negotiations. There was a sense of mutual mistrust between Mr. Johnson and Lancaster officials. Mr. Asturias testified as follows:

> Every time Mr. Johnson tried to renegotiate the deal, we just ratcheted down harder and harder on the terms of the deal. I think that--I did not come up with this idea. The idea was--came up from my boss, Mr. Dukett. I thought it was a very good idea.

Mr. Rodio testified that he made it a point to make sure that Mr. Johnson did not get everything that Mr. Johnson wanted. He also testified that Mr. Johnson was "a hard negotiator" and "a predator".

Respondent makes much of the fact that (1) Mr. Johnson reminded Lancaster city officials to include in written documents the fact that Lancaster was acquiring the 23d Street property under threat of condemnation, and (2) Mr. Johnson was concerned about the tax implications of a move to the Lancaster Auto Mall. Contrary to respondent's contentions, the fact that petitioner may have had tax concerns regarding his sale of the 23d Street property to Lancaster while under threat of condemnation does not lead us to conclude that the deal struck between Lancaster and Mr. Johnson was structured or collusive. See Balistrieri v. Commissioner, T.C. Memo. 1979-115.

We conclude that petitioners had reasonable grounds to believe, and did believe, that Lancaster authorized the threats of condemnation and was likely to carry them out unless a sale or exchange was arranged.

4. Conclusion

The witnesses consistently and credibly testified that Lancaster city officials threatened Mr. Johnson with condemnation of the 23d Street property and that Mr. Johnson believed, and had reason to believe, these threats.

Based on the record, we conclude that a "threat of condemnation" existed, and petitioners sold the 23d Street property because of repeated threats of condemnation from a number of Lancaster city officials.

II.  Fraud/Negligence

Section 6663(a) imposes a penalty equal to 75 percent of the portion of the underpayment attributable to fraud.  Section 6662(a) imposes a accuracy-related penalty equal to 20 percent of the portion of the underpayment attributable to negligence or a substantial understatement.  See sec. 6662(b)(1) and (2).

For purposes of the fraud and accuracy-related penalties, an "underpayment" is the amount by which any tax imposed by the Code exceeds the excess of the sum of the amount shown as the tax by the taxpayer on his return plus amounts not so shown previously assessed (or collected without assessment) over the amount of rebates made.  Sec. 6664(a).  In this case, the adjustments respondent made in the statutory notice of deficiency stem from the determination that petitioners are not entitled to defer recognition of gain on their disposition of the 23d Street property pursuant to section 1033.  We have found that petitioners are entitled to section 1033 deferral of gain; therefore, there is no "underpayment", and petitioners are not liable for penalties pursuant to section 6663(a) or section 6662(a).

III.  Failure to File

The section 6651(a)(1) addition to tax for 1992 was based on the deficiency determined by respondent.  As a result of our holding that petitioners are entitled to defer recognition of

gain on the disposition of 23d Street property, petitioners are not liable for the 1992 deficiency.  As there is no deficiency, we have no jurisdiction over this addition.  See sec. 6665(b); Meyer v. Commissioner, 97 T.C. 555, 562 (1991).

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

for petitioners.